**UNITED STATES of America, Plaintiff,**

v.

**E. K.\*, Defendant.**

**No. CR 79–47.**

United States District Court,
D. Oregon.

May 24, 1979.

---

\* Pursuant to the provisions of 18 U.S.C., § 5038 I use only the initials of the juvenile involved here. Similarly, members of his family to whom reference is made are described in like fashion.

William Youngman, Asst. U. S. Atty., Portland, Or., for plaintiff.

David Slader, Portland, Or., for defendant.

## OPINION

JAMES M. BURNS, District Judge:

This case presents the bleakest of dramas. The events are unrelievedly sad for society and unutterably tragic for the young man who has been thrust on center stage as the main actor. The misshapen young life of this accused juvenile; the wasted lives of his natural and step-parents whose neglect has contributed to and exacerbated his plight; the misery and abject hopelessness which pervade the conditions with which he has been surrounded; the fear and harm which he has caused his victims; the complex governmental, social and cultural conditions which have combined to furnish, at best, only a dim and distant hope for the future of this juvenile; the escalating nature of the harm which he can, and perhaps will do—all these factors, and others equally distressing, are the raw material out of which this drama emerges.

But this is no mere stage drama. It is an all too real criminal episode in which the juvenile committed or was accused of committing serious—even dangerous—acts, which if all were proved against an adult would be punishable by 30 years imprisonment. This is nearly twice the young man's present age.

E.K. is a Warm Springs Indian. For most of his life, he has lived on the Warm Springs Reservation. He is 17 years old, his birth date being March 20, 1962.

On March 9, 1979, the government filed an information charging E.K. with three acts of juvenile delinquency, including burglary (Count I), theft (Count II), and assault with a deadly weapon (Count III). The maximum sentences available for each, if committed by an adult, would be 20 years on Count I and 5 years for each of Counts II and III. Accordingly, the government was authorized to move to transfer him to adult status.[1] 18 U.S.C. § 5032. The government filed a motion to transfer the proceeding to adult court after filing an appropriate certification that the State of Oregon lacks jurisdiction because E.K. is an Indian, the alleged crime occurred on the Warm Springs Indian Reservation, and that the Warm Springs Tribal Court does not have available programs or services adequate for the needs of the defendant. *Id.* A transfer hearing was held March 29, 1979. I took the matter under advisement.

On April 4, 1979, I delivered a brief oral opinion denying the motion to transfer. The substance of the record made there was that I could not conclude that a transfer would be in "the interest of justice" (§ 5032) in this case because E.K. demonstrated some potential for rehabilitation, under special circumstances, during the period of his minority. I stated that I had considered all statutory criteria. I made oral findings as to each sufficient to deny the motion to transfer. I stated I would later reduce those findings to written form. I then postponed the dispositional hearing on the matter until April 9. As a part of this ruling, I made an oral finding that excludable delay had occurred.[2] Any issue

---

1. Under § 5032, a motion to transfer will lie only if the juvenile has "committed an act after his 16th birthday which if committed by an adult would be a felony punishable" by 10 years or more in prison. It is unnecessary to decide if such a motion would lie here if Counts II & III alone were filed.

2. Title 18 § 5036 provides that if the alleged delinquent is in detention pending trial, he must be brought to trial within 30 days, from the date upon which such detention was begun. In this instance, that date was March 9, 1979, making April 9, 1979, the final day for trial

(April 8 was Sunday). Section 5036, however, provides that dismissal of the proceedings may be avoided if additional delay was "caused by the juvenile or his counsel, or consented to by the juvenile and his counsel, or would be in the interest of justice in the particular case." That section also provides that excusable delay may not be based upon congestion of the court calendar. The section also provides "except in ordinary circumstances" where an information thus dismissed, it may not later be reinstituted.

of excludable delay became moot on April 6. On that date E.K. came before the court and, pursuant to a "plea bargain," admitted Count I (burglary) as charged in the information, and the government agreed to dismiss the other two counts. Thereafter, at a separate dispositional hearing, § 5037, I committed E.K. to the custody of the Attorney General until his 21st birthday.

## I. JURISDICTION OF THIS COURT:

The contention was raised that this court lacks jurisdiction to hear this matter because the State of Oregon, notwithstanding the certification to the contrary filed with this court, does in fact have jurisdiction over the person of the juvenile. Counsel for the juvenile relies upon ORS 419.476 which provides that:

> . . . The juvenile court has exclusive original jurisdiction in any case involving a person who is under 18 years of age and: . . . Who *has committed an act* which is a violation, of *which if* done by an adult *would constitute a violation, of a law* . . . of the United States . . . . (Emphasis added.)

The "juvenile court" referred to is of course a court of general and equitable powers with jurisdiction over certain subject matter relating to juveniles and domestic affairs, all of a civil nature. ORS 419.472–419.476.

This argument fails. The State of Oregon does not have jurisdiction over the person of E.K. for the purposes of a civil proceeding such as an adjudication of delinquency, and it does not have jurisdiction over the substantive criminal offenses which comprise the alleged acts of juvenile delinquency.

### A. OREGON HAS NO JURISDICTION OVER A CIVIL PROCEEDING ARISING ON THE WARM SPRINGS RESERVATION TO WHICH A WARM SPRINGS INDIAN IS A PARTY

■ Generally speaking, an Indian tribe possesses all the powers of a sovereign state, including the powers of internal governance over relationships between tribal members. While these powers are of course limited by treaties and subsequent acts of Congress, *unless* so qualified, jurisdiction over the conduct between and among Indians within Indian Country remains vested in the tribes and their duly constituted tribal governments. See, F. Cohen, Handbook of Federal Indian Law 123 (1945).

---

Questions of excludable delay under this section are perhaps somewhat different from the comparable section of the Speedy Trial Act, 18 U.S.C. § 3161(h). Considerable time necessarily elapses in processing of a case such as this for a number of reasons. In the first instance, where, as here, the juvenile had a previous juvenile delinquency adjudication, the record of that earlier proceeding has been sealed pursuant to § 5038. Consequently it was necessary for the government to apply for an order of court authorizing unsealing of the previous record for the purpose of allowing the U. S. Attorney to seek permission from the Justice Department to file a transfer motion. This consumed some amount of time. Further, additional time was consumed by the process involving the request by the U. S. Attorney for authorization to transfer to be forwarded to Washington, D. C. and considered by the appropriate officials in the Justice Department, and then for their decision (if it is to allow transfer) to get back to the U. S. Attorney, who must then prepare and file the motion to transfer. As a result, in this case it was not until

March 23, 1979, that the government was able to file a motion to transfer. Thus, nearly little over one-half of the time allowed for bringing the case to trial had elapsed. In addition, once the hearing is had upon the motion to transfer some time necessarily elapses while careful consideration is given to the criteria set forth in § 5032. This is particularly true as to the analysis of "the nature of past treatment efforts and the juvenile's response to such efforts." Even more difficult and time consuming in this case was the determination of "the availability of programs designed to treat juvenile's behavioral problems." With respect to the last mentioned factor the judge is required to assume that the accused juvenile has committed the act for which he has been charged; *otherwise, one would not be concerned over* the availability of a treatment program or facilities. Since facilities available in western states for treatment of federal juveniles are nonexistent, an extensive search had to be made to determine availability of programs and/or facilities so that the determination called for by § 5032 could be made.

■ While Congress has withdrawn federal jurisdiction over criminal offenses and granted both criminal and civil jurisdiction in Indian Country to certain designated states, 18 U.S.C. § 1162(a) and 28 U.S.C. § 1360(a), it has specifically exempted from any grant of jurisdiction that geographical area in the State of Oregon lying within the Warm Springs Reservation.[3] Thus the juvenile court of the State of Oregon does not have jurisdiction over any juvenile proceeding to which a Warm Springs Indian, domiciled upon the reservation, is a party. In fact, the state has in the past sought to exercise juvenile court jurisdiction only over Indian infants (not members of a tribe within territory exempted from state jurisdiction by 28 U.S.C. § 1360(a)) where such children had not lived on a reservation and were not claimed to have ever been domiciled upon a reservation. *State ex rel. Juvenile Dept. v. Greybull*, 23 Or.App. 674, 677–78, 543 P.2d 1079, (1975).

In short, I conclude that where the State of Oregon has not been granted extraterritorial jurisdiction over the person of a Warm Springs Indian for any civil or criminal matter arising upon the Warm Springs Reservation, extraterritorial jurisdiction does not exist in the juvenile court of the circuit court of the state merely because the juvenile is such a Warm Springs Indian who is under 18 and has committed an act which, if done by an adult, would be a violation of a law of the United States.

### B. *OREGON HAS NO JURISDICTION OVER THE FEDERAL OFFENSES WHICH CONSTITUTE THE ALLEGED ACT OF JUVENILE DELINQUENCY IN THIS CASE*

■ I reach the same conclusion, namely, that the state lacks jurisdiction in this matter, by another line of reasoning as well.

Under the interplay of laws in this case, an anomaly would result if the juvenile's

jurisdictional argument were correct. If E.K., a Warm Springs juvenile, were indeed subject to the jurisdiction of the juvenile court of the state, his case would be incapable of transfer to an adult court of the state. In short, he would be a non-remandable juvenile, despite the provisions of ORS 419.533. He is charged with a federal offense over which the adult state court has no jurisdiction. Hence, the state could not have criminal jurisdiction over him as an adult.

Thus, no matter what the circumstances, nor how aggravated the crime, a Warm Springs juvenile offender could never be tried as an adult in state court where the offense occurred on the reservation.

Faced with a similar situation, the Eighth Circuit has apparently concluded that the *exclusive* federal jurisdiction over the acts enumerated in § 1153 precludes state jurisdiction when the alleged act of juvenile delinquency does not constitute a cognizable state offense as well as a federal crime. This is the situation which arises with a violation by an Indian on a reservation on exempted Indian Country. *See U. S. v. Allen*, 574 F.2d 435, 438 n.5 (8th Cir. 1978). The Eighth Circuit's construction of the Juvenile Delinquency Act assumes that the state must properly be able to exercise jurisdiction over the person for the very *act* which is the basis for the charge of juvenile delinquency.

### II. *STANDARD OF ADMISSIBILITY OF EVIDENCE IN A HEARING ON A MOTION TO TRANSFER:*

Counsel for the juvenile raised an objection to the evidence submitted at the transfer hearing as to the circumstances of the facts out of which the juvenile accusation arose. This evidence came in the following fashion. A preliminary hearing (or its equivalent) was held before the Magistrate

---

**3.** According to 28 U.S.C. § 1360(a) ". . . opposite the name of the State or Territory to the same extent that such State or Territory has jurisdiction over other civil causes of action, and those civil laws of such State or Territory that are of general application to pri-

vate persons or private property shall have the same force and effect within such Indian country as they have elsewhere within the State or Territory: . . . Oregon All Indian country within the State, except the Warm Springs Reservation . . . ."

shortly after the juvenile was taken into custody.[4] At the transfer hearing, the government offered (Ex. 4) a transcript of the testimony of an FBI agent who was the sole witness at the preliminary hearing. The agent's testimony recited the substance of the three charges, as told to him by relevant tribal police and residents who had first-hand knowledge of the activities of the juvenile. Counsel's objection was, essentially, based upon hearsay and upon confrontation and due process constitutional grounds.

The Federal Juvenile Delinquency Act (FJDA) of 1974, Public Law 93–415, Title V, 18 U.S.C. §§ 5031–5042, defines juvenile delinquency as "the violation of a law of the United States committed by a person prior to his eighteenth birthday which would have been a crime if committed by an adult." 18 U.S.C. § 5031. An adjudication of delinquency under the provisions of this act is a determination of status, and not a conviction of crime. *Allen, supra*, 574 F.2d at 437. See also, similar conclusion reached under the same provisions of prior law, *U. S. v. King*, 482 F.2d 454, 456 (6 Cir. 1973).

The FJDA thus does not define a separate offense, but "establishes a procedural mechanism for the treatment of juveniles who are already subject to federal jurisdiction . . . ." *Allen, supra*, 574 F.2d at 437. In the present matter, the youth, E.K., is subject to the jurisdiction of this court because he is a Warm Springs Indian and the acts charged are crimes as defined by the applicable federal statutes, 18 U.S.C. § 1153. Being subject to federal jurisdiction, 18 U.S.C. § 5032 comes into play.[5] While it may be argued that an adjudication of status is a proceeding which is jurisdictionally distinct from the potential criminal proceeding, the intermediate hearing

process created by the Act does not alter the underlying basis for federal jurisdiction at the onset. The charged acts must be proved to be violative of the federal laws in order to support either an adjudication as a delinquent, or a conviction as an adult in the event of transfer.

Section 5032 as amended in 1974 removed the decision to proceed with juvenile or adult trial from the sole discretion of the U. S. Attorney. Now, in order to initiate what may result in a criminal prosecution against a juvenile, the government must first proceed by information (and certification) followed by motion to transfer.[6] Thus juveniles over 16 who are charged with serious offenses may be criminally prosecuted through trial as adults, absent consent, only after the motion to transfer, plus findings made by the district court employing the statutory criteria. Such a motion puts at issue the question of how the juvenile should be treated "in the interest of justice."

The motion is indeed an intermediary step when viewed in the perspective of a final resolution of the matter, but upon its filing it becomes the essential preliminary step in any criminal prosecution of the juvenile. Absent a motion to transfer, the proceeding will never ripen into a criminal prosecution but will remain a delinquency proceeding. After the filing of the motion, the criminal proceeding will thereafter terminate should the district court deny the transfer as that being in the "interest of justice." *U. S. v. Rombom*, 421 F.Supp. 1295, 1298–99 (S.D.N.Y.1976). Thus the proceeding held upon hearing a motion to transfer is such a "preliminary hearing in a criminal case" that the traditional rules of evidence for the conduct of trial do not apply. Fed.R.Evid. 1101(d)(3).

4. It seems unclear under the FJDA whether a "preliminary hearing" is required; § 5034 does not, in terms, so specify. See Rule 54(b)(5), Fed.R.Crim.P. In any event, here, such a hearing was had. It is also unnecessary to consider the effect of a "preliminary hearing" upon an adult prosecution in view of the language of the next to last paragraph of § 5032.

5. Prior to the Juvenile Delinquency Act of 1938, juveniles charged with federal crimes were prosecuted as adults.

6. Unless the juvenile, with advice of counsel, consents in writing to adult trial, § 5032. It is unclear whether a 15 year old can so consent.

Of course, the juvenile must nonetheless be guaranteed a hearing in which he is "accorded all due process rights." Senate Report on P.L. 93–415, Code Cong. & Admin.News (1974) at 5320. Thus while the evidence received need not be measured by the standards of admissibility in a criminal trial, it must "measure up to the essentials of due process and fair treatment," since that hearing is a " 'critically important' action determining vitally important statutory rights of the juvenile." *Kent v. United States*, 383 U.S. 541, 554, 556, 86 S.Ct. 1045, 1055 (1966).

While the Supreme Court has ruled upon the due process rights of juveniles in a series of cases, the *Kent* case remains particularly relevant to the matter now before me.[7] That case concerned a 16 year old youth charged with serious crimes under the laws of the District of Columbia. At issue was the propriety of the juvenile court's waiver of jurisdiction. There, as in this case, the scrutinized hearing was *prior* to any adjudication of delinquency. The Court emphasized that the decision to retain jurisdiction or to remand requires "procedural regularity sufficient in the particular circumstances to satisfy the basic requirements of due process and fairness, as well as compliance with the statutory requirement    . . . ." 383 U.S. at 553, 86 S.Ct. at 1053.

Moreover, the Court in *McKeiver v. Pennsylvania*, 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971), declined to require criminal trial-like due process standards even in the *adjudicative* phase of a juvenile proceeding—a stage *not* yet reached in this matter:

> The arguments [advanced by the juvenile for jury trial] necessarily equate the juvenile proceeding—or at least the adjudicative phase of it—with the criminal trial. Whether they should be so equated is our issue. Concern about the inapplicability of exclusionary and other rules of

evidence, about the juvenile court judge's possible awareness of the juvenile's prior record and of the contents of the social file; about repeated appearances of the same familiar witnesses in the persons of juvenile and probation officers and social workers—all to the effect that this will create a likelihood of pre-judgment—chooses to ignore it seems to us, every aspect of fairness, of concern, of sympathy, and of paternal attention that the juvenile court system contemplates. 403 U.S. at 550, 91 S.Ct. at 1989.

▮ These principles, usually reserved for the treatment of juveniles, were foremost in the contemplation of the framers of the Juvenile Justice Act. The legislative history confirms the rehabilitative purposes of that Act. These principles thus guide me to apply a most liberal standard of admissibility of evidence in this matter, using as precedent the considerations which govern evidence in other preliminary hearings. Fed.R.Evid. 1101(d)(3). Thus, counsel's objections were overruled.

### III. STANDARD FOR GOVERNING TRANSFERS: "THE INTEREST OF JUSTICE"

The very legislative history which answers the question concerning the standard of evidence to employ through its emphasis upon the concern and solicitude for rehabilitation raises yet another question.

My statutory duty in this matter is to authorize a transfer if I find it to be in the "interest of justice." § 5032. Also, I am required to make findings based upon evidence of E.K.'s milieu, past behavior, rehabilitative potential, and the availability of facilities realistically calculated to fulfill his individual needs for treatment. These unique facts must apparently form the basis for my conclusion whether a transfer would be in the more general "interest of justice," or not.

---

7.  *See, Haley v. Ohio*, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948);  *Gallegos v. Colorado*, 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962);  *Kent, supra;  In re Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967);  *DeBacker v. Brai-*

nard, 396 U.S. 28, 90 S.Ct. 163, 24 L.Ed.2d 148 (1969);  *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368;  collected and discussed in *McKeiver, supra*, 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971).

Congress, in passing the Juvenile Justice Act, consistently placed its emphasis upon the individual's needs. The Senate Report discusses the criteria for rehabilitation enumerated by the statute.

> If a juvenile is proceeded against in Federal court, he or she shall be proceeded against as a juvenile unless he or she requests, with advice of counsel, to be treated as an adult, or unless he or she is over sixteen years old, is allegedly to have committed a felony, and after a hearing upon motion of the Attorney General at which the juvenile is accorded all due process rights, is found by the court to have *no reasonable prospects for rehabilitation before his or her twenty-first birthday.* (Emphasis added.) 1974 Code Cong. & Admin.News, p. 5320.

Paternal attention towards a person may conflict with society's interest in invoking sanctions so as to not depreciate the seriousness with which it views that person's antisocial—even seriously harmful—conduct. Concentration on rehabilitation of an individual requires a focus quite apart from that necessary in order to mete out punishment calculated to deter others from engaging in the same conduct.

In short, "rehabilitation" on one hand, and society's overall interest in justice on the other, are to some extent competing theories. As Justice White observed in *McKeiver, supra,*

> The criminal law proceeds on the theory that defendants have a will and are responsible for their actions. A finding of guilt establishes that they have chosen to engage in conduct so reprehensible and injurious to others that they must be punished to deter them and others from crime. Guilty defendants are considered blameworthy; they are branded and treated as such, however much the State also pursues rehabilitative ends in the criminal justice system.

> For the most part, the juvenile justice system rests on more deterministic assumptions. Reprehensible acts by juveniles are not deemed the consequence of mature and malevolent choice but of en-

vironmental pressures (or lack of them) or of other forces beyond their control. Hence the state legislative judgment not to stigmatize the juvenile delinquent by branding him a criminal; his conduct is not deemed so blameworthy that punishment is required to deter him or others. Coercive measures, where employed, are considered neither retribution nor punishment. Supervision or confinement is aimed at rehabilitation, not at convincing the juvenile of his error simply by imposing pains and penalties. Nor is the purpose to make the juvenile delinquent an object lesson for others, whatever his own merits or demerits may be. 403 U.S. at 551–52, 91 S.Ct. at 1989.

This dichotomy does not exist in theory only. These competing philosophies must be applied in the real world. The dichotomy is underscored by the structure of the FJDA itself. Federally accused young people over 18 years of age are presumptively and conclusively adults in the eyes of the law. Similarly accused persons less than 16 years old are presumptively and conclusively children, absent, perhaps their consent. (Note 6.) As a youngster approaches 18, and is charged with a felony offense, the presumption of juvenile status may be put to close scrutiny. These factors (upon motion for a transfer hearing) trigger an inquiry into the extent which the societal interest in justice would require the application of penal sanctions if the acts were proven to have occurred.

Thus, for the purpose of weighing the "interest of justice" in the disposition of this case, I am compelled to consider how that interest would be served if the individual were adjudicated or found guilty as charged and committed or sentenced accordingly. Similarly, I must take the nature and seriousness of the offense into account in determining the rehabilitative potential of the individual. The criteria also require some inquiry into the availability of adequate places and programs to "treat" the juvenile should he indeed be adjudicated delinquent on the basis of the same underlying acts. The statute and leg-

islative history force contemplation of what in all likelihood will be the consequence for the individual of the transfer decision.

The rehabilitative philosophy which underpins the FJDA is thus tempered by a realistic outcome-oriented analysis when the presumption of juvenile status is challenged in the transfer hearing process. This orientation guides the application of the criteria to a particular case, for, of course, it is unlikely that one can find a distinct demarcation between "juvenile" and "adult" which will fully satisfy the competing interests in every case. Psychologists, psychiatrists, youth counselors and all parents can well recognize how arbitrary such a distinction based on age will be in many, perhaps most, cases. Few of us over the age of 18 can recall gaining any significantly greater measure of wisdom, insight or skill on the day after our 18th birthday which we did not already possess in the very days before that birthday. Nevertheless, the balance must be struck somewhere and somehow between providing a rehabilitative environment for young offenders as well as protecting society from violent and dangerous individuals and providing sanctions for anti-social acts. And that balance must be struck by the district court in the context of a transfer hearing.

In so seeking the balance, I find a single criterion emerging as paramount, namely, where the "interest of justice" is sufficiently strong so as to warrant transfer of an older juvenile accused of a serious crime. This would be the result when it appears that there is no further utility to be served in continued application of the juvenile justice rehabilitative system. For example, the transfer inquiry may reveal that the youth is unavailing of help or that places or programs for treatment for his particular condition are simply unavailable. In these latter cases, continued exercise of juvenile jurisdiction may well be a futile gesture. Empty exercises do not serve the interest of justice. Nor should society risk danger to itself where a continued, escalating pattern of violence shows that the risk is too great to be borne. However, since the presumption is that an offender of a certain age is a juvenile, the facts ought to clearly convince one on the side of these conclusions in order to warrant transfer.

A finding that rehabilitation is not possible because of the absence of a specialized *juvenile* facility does not brand an individual a "hard-core criminal." Labels do not materially assist this analysis. Rather, such a finding specifically required by the FJDA when treatment is unavailable bespeaks the underlying logic that juvenile system treatment is not to be employed in the instance of a person over 16 years of age who has committed a serious offense when it is manifest that such treatment has no chance of success. At such a point the balance indeed tips to the interest of society in employing the criminal justice system.

It is incumbent upon the court to deny a motion to transfer where, all things considered, the juvenile has a realistic chance of rehabilitative potential in available treatment facilities during the period of his minority. Denial of a motion to transfer does not require a finding that the transfer would not serve the interest of justice. Denial simply means that the existence of corrigible personality factors mandates continued treatment of the offender as a juvenile. Where realistic chance for rehabilitation exists, the balance ought not to tip in recognition of the general societal interests subsumed in the broader sense of the word "justice." However, where no realistic chance for rehabilitation exists, we have the clearest case where the balance does indeed tip in favor of bringing the philosophy of the criminal justice system into play. In such a case, when for whatever reasons the balance tips decisively, it is incumbent upon the court to grant the motion to transfer in statutory deference to society's needs, however unfortunate the facts of a particular individual's environment and despite the admitted shortcomings of the criminal model for producing rehabilitation.

Thus I am convinced that given the nature of E.K.'s problems and the prior lack of success he has had in other juvenile

treatment facilities, as well as the escalating seriousness of the offenses with which he has been charged, I would have been required to grant the motion to transfer him to adult status, had there not existed the one specialized juvenile facility in Denver most likely to allow a chance for rehabilitation referred to in the findings below. The existence of such a placement precludes a conclusion that no chance for rehabilitation for E.K. exists before his 21st birthday.

## IV. ADMISSIBILITY OF TRIBAL JUVENILE DELINQUENCY ADJUDICATIONS

In Finding of Fact No. 8, below, mention is made of the objection placed by counsel for the juvenile to admission of his tribal juvenile record. As shown there, this youth has a lengthy and melancholy juvenile record.

All of these mentioned juvenile charges were processed in the tribal court maintained for the Confederated Tribes of the Warm Springs Reservation. At the hearing it was suggested that E.K. had not been represented by retained or appointed counsel at these juvenile proceedings before the tribal court. Under the Civil Code of the Confederated Tribes of the Warm Springs Reservation, there is no right to be represented by retained counsel in the sense most commonly understood in state and federal jurisprudence. One may be "represented" before the tribal court by an advocate or spokesman certified to make such appearances. Counsel for E.K. objected to the introduction of the juvenile proceedings records, in part on the basis that they were obtained in the absence of counsel.

I am permitted, indeed required, by the Act (§ 5032) to consider the "extent and nature of the juvenile's prior delinquency record." I am not statutorily restricted only to delinquency adjudications, nor does the statute limit me to those adjudications which comport in every respect with the proceedings practiced in the state or federal courts. Thus, I ruled that I should receive and consider the tribal court "records" (Ex. 9). I did so mindful of the special "nature" of the circumstances and proceedings which culminated in the record.

I am convinced that the tribal juvenile practice and procedure as it appears on this hearing record were not so lacking in fundamental fairness within the special circumstances of juvenile proceedings as to have failed to accord E.K. sufficient due process at the time. I conclude that consideration of the record in its limited context in the present hearing does not deprive him of due process.

Further, there is no indication in the record that E.K. was at any time ever placed in a position different from that of any other juvenile before the tribal court. There is no evidence that he was not able to secure, or when requesting one was actually denied the opportunity to be represented by, a duly certified advocate or spokesman before the tribal court.

The Oregon Court of Appeals has had the opportunity to review this particular feature of the advocacy practice before the Warm Springs Tribal Court. In *Red Fox and Red Fox*, 23 Or.App. 393, 542 P.2d 918 (1975), that court considered the validity of a prior tribal court judgment and decree of divorce between two members of the tribe. The husband later challenged the tribal decree as having been gained by means of a procedure which denied him fundamental due process, in that he was denied the right to be represented by the retained attorney of his choice, a member of the state and federal bar, who was not a certified tribal advocate. The court rejected this argument:

> The obvious response here is that one is not deprived of a "right" to representation because a court will not permit a specific individual to appear before it. No constitutional claim arises from the limitation of representation to those satisfying specific qualifications where those so qualified are, in fact, available to a litigant. 23 Or.App. at 401, 542 P.2d at 922.

I thus conclude that there is nothing constitutionally repugnant in the tribal

court scheme of representation in juvenile matters, although that scheme differs from that practiced in this or other courts of the United States. For the limited purposes for which the delinquency record is used in these proceedings, the tribal scheme is fundamentally and adequately fair under the circumstances. The record is devoid of any suggestion that E.K. could not have availed himself of the full measure of such representation before the tribal court.

*FINDINGS OF FACT:*

1. E.K. is 17 years old. He was born March 20, 1962.

2. E.K. is an enrolled member of the Warm Springs Indian Tribe.

3. E.K. is the son of H.K. Jr. and E.H.K. (both deceased). He has an older brother, aged 19, and an older sister, aged 17.

4. E.K.'s parents did not provide a stable home environment during the period of time in which the children resided with them under parental control. The marriage was characterized by separations. It terminated in divorce, and the father remarried before his death. Each partner exhibited signs of, and frequently failed to discharge parental functions because of, chronic alcohol abuse.

5. E.K. has not resided with either or both of his parents on a regular basis since he has been approximately seven years of age. He has resided with a variety of family members, friends and in institutional settings since that time. He has not received consistent care or attention or sufficient discipline in these placements which have varied in duration from several weeks to several years.

6. E.K. completed the eighth grade and was enrolled in Madras Senior High School in Madras, Oregon, on several occasions. Most recently, he was expelled from school because of a confrontation with school authorities.

7. E.K. has been domiciled all of his life within the boundaries of the reservation of the Confederated Tribes of Warm Springs (except for several periods of custodial institutional placements). On occasions, he has lived with family members who practice what is termed to be a "traditional" Indian lifestyle. On the whole, however, this youth's social environment has been deleterious. Its single consistent theme has been exposure to peers and family members who regularly abuse alcohol. In this social environment, E.K. himself has intermittently abused alcohol, and has sniffed glue, resulting in at least two admitted instances with serious inappropriate and anti-social behavior.

8. E.K. has the following juvenile delinquency record:

a) The most recent episode before the one involved in this case was an adjudication of delinquency under FJDA on a charge of attempted burglary in the second degree (18 U.S.C. § 1153, ORS 164.215 and 161.405). This adjudication occurred on February 6, 1978. As a result, I committed him to the custody of the Attorney General for treatment for a maximum period of one year. The juvenile in December 1977 had been charged with burglary in the second degree (ORS 164.215) which carried a maximum sentence of five years. As of that time he was still 15 years of age. Under the applicable statutory scheme if he had been adjudicated a delinquent on the burglary charge I could have (and probably would have) committed him to the custody of the Attorney General for treatment for a period of either five years or until his 21st birthday, whichever was lesser, 18 U.S.C. § 5032. Thus, the maximum available period of custody or supervision would have been only five years. As a result of plea bargaining, however, the 1977 charge was reduced to a misdemeanor (attempted burglary in the second degree), thus putting a lid of one year (the maximum for a misdemeanor under Oregon law) during which time he could be placed in the custody or under the supervision of the Attorney General.

It was apparent to all concerned as of that time, as it is now, that the juvenile was badly in need of structure in which he could acquire discipline and consistent habits of

assuming responsibility. (Ironically, the authorities (Bureau of Prisons and U. S. Parole Commission) construe FJDA commitments as being subject to the mandatory release provisions of 18 U.S.C. 4164.) Thus, he was only in actual custody until October 27, 1978, a period of less than nine months. He was then mandatorily released and returned to the Warm Springs Reservation, under supervision conditions which were less than ideal.

What is glaringly apparent here is that our adversary system places counsel for an accused juvenile in a cruel dilemma. On the one hand, counsel's job is to bargain the case down as low as possible in terms of exposure. On the other hand, counsel could not have escaped knowing that a substantial period of custody and structured living was badly needed for this youth. Lest this be taken as criticism of defense counsel, I hasten to add that the prosecutor, in agreeing to a reduction, and I, in accepting the "plea bargain," must surely share in the blame, if blame is involved.

In February 1978 all concerned, the probation officer, the prosecutor, defense counsel and myself, struggled to try to locate an appropriate facility in which the juvenile could be placed. The only placement then available on the west coast was with the California Youth Authority. Initially the juvenile was placed in a relatively open facility in California. After about one month he was transferred to a close custody facility because of his disruptive and aggressive behavior.

b) The following is a summary of his record before the tribal court in Warm Springs as a juvenile: He was charged with shoplifting in March 1975, which case was dismissed; he was charged with breaking and entering on five separate occasions between April 23, 1975, and June 22, 1975; he was charged with three separate occurrences of malicious mischief between April 1975 and October 1978; he was charged with one accusation of making a bomb threat in April 1975, one of runaway from the tribal jail, and escape from the tribal group home in November 1975; he was charged on two occasions with paint sniffing in October 1975 and September 1976; and finally with two separate instances of being a minor in possession of liquor in October 1976 and May 1977.

While the record is somewhat unclear, Exhibit 9, a list of the tribal juvenile court record, tends to show that as to most charges, he was adjudicated as a delinquent. On a few of these occasions, the accusation was apparently dismissed. Given the disposition in this case, it is unnecessary for me to make a finding as to the precise number of juvenile adjudications. It seems beyond dispute that in more than a majority of the occasions when he was accused of delinquent acts an adjudication of delinquency was made. Counsel for the juvenile objected to the admissibility of Exhibit 9. He objected separately to admissibility of any or all of the juvenile adjudications in the Warm Springs Tribal Court on two bases. The first was that Exhibit 9 was hearsay and, therefore, inadmissible. The second was that these were uncounselled adjudications, in violation of constitutional rights. Discussion of this latter point is contained in Section IV of this opinion. I am satisfied that my overruling of the hearsay objection was correct. If it was incorrect, I am satisfied it was harmless error in view of the vast array of uncontested evidence as to the extensive juvenile record.

9. E.K. is presently before this court upon an information charging juvenile delinquency based upon separate charges of burglary, theft of a rifle and an assault with a dangerous weapon, i. e. the stolen rifle, a short time later. The evidence, if true, would indicate a substantial disregard for human safety and a severe indifference to socially accepted norms of behavior. If proved, it would be the most aggressive act by this juvenile to date. I further find that any such acts of violence were very likely related to situational stress factors to which the youth reacts impulsively. There is no earlier indication of a consistent pattern of violence committed by the juvenile.

10. All those associated with E.K. agree that he is of average or above average

intelligence. Probably due to lack of stability, he has not performed well in traditional academic settings. E.K. testified at the hearing. He presented a composed, agreeable demeanor and reflected average or above average intellectual grasp of the situation. He gave appropriate responses for a youth his age under the circumstances. He seemed to me matured somewhat over his appearance a year ago on the attempted burglary charge.

11. A number of witnesses testified concerning various aspects of E.K.'s overall psychological development.[8] These witnesses included a psychiatrist, several juvenile counselors, and other adults who have had contact with the youth over the past few years. Through consideration of testimony of these witnesses, two psychiatric evaluations (prepared on January 13, 1978, and April 4, 1979), and the file compiled by the California Youth Authority, I have tried to make an assessment of E.K.'s emotional and personality development. E.K.'s interpersonal relationships, both with peers and authority figures, are guarded and marked by extreme distrust. He often assumes a hostile role, and seems to expect rejection and hostility from others. After considerable time and sustained effort, several youth workers (and the psychiatrist) felt they had established trust and general rapport with E.K. While these initial negative attitudes are understandable in light of the rejection and neglect in E.K.'s background, these attitudes are consistent with a stage of development normally exhibited at a much younger chronological age than 17.

E.K.'s demonstrated lack of judgment, low level of personal insight, rejection of responsibility in unconfined living situations, and his failure to appreciate the inevitable consequences of his behavior are also indicia of a very immature level of emotional maturity. These components of E.K.'s psychological development indicate that his emotional and personality traits are generally those of a youngster younger than E.K.'s present chronological age. I conclude therefore that he is psychologically immature. Consistent with my conclusion that he possesses some potential for rehabilitation before his twenty-first birthday, I do not find that this present immature level of psychological development is beyond modification to a more normal adult level within that period of time.

12. Past treatment efforts have been in the nature of confinement, counselling and support services upon the reservation; confinement to Pitchford Boys Ranch in the State of Oregon, and placement with the California Youth Authority (CYA) during much of 1978. E.K., while at the CYA, was placed in a fairly open environment. A short time later, he was transferred (and adapted with some degree of success) to a more structured (confined) environment. Past treatment efforts have not been of substantial duration in any one setting. The record shows that the youth apparently responds most favorably to a controlled environment, coupled with frequent contact with a few adult authority figures who are humane, consistent and realistic. It is evident that he has not shown improvement in adaptive behavior in minimal confinement or open-living situations.

13. There are no custodial programs available for his treatment, as a juvenile, here in Oregon or in adjacent states. Under the

---

8. The statute, § 5032, requires me to evaluate the "psychological maturity" of the accused juvenile. Congress did not see fit to provide the courts with much in the way of tools—definitional or otherwise—to do the job assigned to us in applying this criterion. Perhaps this stems from the overall aim of getting federal officials out of the juvenile court arena. Perhaps it stems from other reasons. The witnesses—both lay and professional—seemed somewhat taken aback when asked opinion questions using the term "psychological maturity" as one of the relevant criteria. They seemed more at ease with the term "emotional maturity." I note that Chief Judge Schwab, of the Oregon Court of Appeals, with his usual perceptiveness, implied that psychological immaturity would be a factor militating against transfer of a juvenile to adult court. Presumably, therefore, psychological maturity would incline one toward transfer. *State ex rel. Juv. Dept. v. Kent*, 31 Or.App. 1219, 1228, 572 P.2d 1059 (1977). Congress itself, in enacting § 5032, gave no indication that psychological maturity would be a factor favoring or disfavoring transfer.

deprived circumstances here, geographic considerations play a minimal role in placement. It does appear that a secure, humane and realistic setting is available in Denver, Colorado, at the Emerson House. The stark alternative is that he would go to "prison" if remanded and handled as an adult.

Since I cannot say that I must find that he is not likely to be rehabilitated, before he reaches 21, remand is a preferable disposition, and consequently the motion to transfer is denied.