**UNITED STATES of America**

v.

**M.H., a Juvenile.**

**Crim. No. 1:95–CR–82.**

United States District Court,
E.D. Texas,
Beaumont Division.

Sept. 5, 1995.

## ORDER

HEARTFIELD, District Judge.

On this day the court considered the defendant's objections to the United States Magistrate Judge's Report and Recommendation and the Government's response thereto. After conducting a *de novo* review of the record, the court hereby overrules defendant's objections, and follows the United States Magistrate Judge's Report and Recommendation, thus granting the government's motion to transfer the proceedings against this juvenile to an adult prosecution.

## *REPORT AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE*

HINES, United States Magistrate Judge.

### *I. PROCEDURAL BACKGROUND*

M.H., a juvenile, is charged by information with seven counts of knowingly obstructing, delaying, and affecting commerce and the movement of articles in commerce by robbery (18 U.S.C. § 1951 (1994)) and with seven counts of knowingly using and carrying a firearm during and in relation to crimes of violence (18 U.S.C. § 924(c)(1) (1994)).

The United States District Court obtained jurisdiction to proceed against the juvenile defendant upon certification by the U.S. attorney (1) that the State of Texas does not have an adequate variety of programs available to meet the rehabilitative requirements of its juveniles and (2) that there is a significant federal interest in the case by virtue of the fact that defendant is charged with numerous violent crimes involving restaurants involved in interstate commerce. 18 U.S.C. § 5032 (1994).

On July 19, 1995, the United States moved to transfer proceedings against M.H. to adult criminal status. The motion was referred to the undersigned United States Magistrate Judge.

A federal public defender was assigned to represent M.H., and an initial appearance was conducted on July 25, 1995 at which the juvenile was informed of the charges and advised of his rights.

On August 4, 1995, the transfer hearing that is the subject of this report was held on the government's motion to proceed against M.H. as an adult.

## II. LEGAL FRAMEWORK

■ The main thrust of a juvenile proceeding is rehabilitation and not retribution. Thus, juvenile proceedings in U.S. district courts must normally conform to the procedures dictated by the Juvenile Justice and Delinquency Prevention Act, 18 U.S.C. § 5031 et seq. Yet there are two exceptions that authorize the government to proceed against a juvenile as an adult. The first occurs when the juvenile elects to be proceeded against as an adult. M.H., after consultation with his appointed counsel, has not so elected. The second method occurs when the government, as here, moves to have the juvenile transferred to adult status and can prove that rehabilitation is not likely and that a transfer would be in the interests of justice.

The ultimate aim of the Act is to rehabilitate juveniles, not to punish them. S.Rep. No. 1011, 93d Cong., 2d Sess. 22 (1974), *reprinted in* 1974 U.S.C.C.A.N. 5283, 5286. Congress accordingly circumscribed narrowly the circumstances under which a transfer is permissible over objection. A transfer to adult status may only be directed by the Court over the objection of the juvenile if the juvenile is fifteen years of age or older, if the offense alleged would constitute a violent felony had it been committed by an adult, and if the transfer is in the interests of justice. 18 U.S.C. § 5032 (1994).

■ The first two elements of this test are satisfied. Further, the statute provides explicit guidance on how to proceed in determining whether a transfer would be in the interests of justice. A hearing must be held, and the district court must take evidence on the following six factors: (1) the age and social background of the juvenile; (2) the nature of the alleged offense; (3) the extent and nature of the juvenile's prior delinquency record; (4) the juvenile's present intellectual development and psychological maturity; (5) the nature of past treatment efforts and the juvenile's response to such efforts; and (6) the availability of programs designed to treat the juvenile's behavior problems. *Id.*

At the hearing, evidence must be presented on all six factors. Failure of the government to address any factor leads to a denial of the transfer request. *See United States v. A.J.M.,* 685 F.Supp. 1192 (D.N.M.1988); *United States v. C.B.,* No. 93–CR–81–1 (E.D.Tex. June 1, 1993). If evidence is presented on all six factors, then disposition is to be in the sound discretion of the district court. *United States v. Doe,* 871 F.2d 1248 (5th Cir.1989); *United States v. Hemmer,* 729 F.2d 10, 18 (1st Cir.), *cert. denied sub nom. Randazza v. United States,* 467 U.S. 1218, 104 S.Ct. 2666, 81 L.Ed.2d 371 (1984).

The factors need not be given equal weight. *Doe,* 871 F.2d at 1254–55; *cf. United States v. A.W.J.,* 804 F.2d 492, 493 (8th Cir.1986). For example, the district court may determine that one factor, such as seriousness of the crime, outweighs the other five factors. *See e.g., Hemmer,* 729 F.2d at 18.

■ Finally, although Congress intended for rehabilitation to be the primary focus, the district court considering the motion to transfer is not required to subscribe to what amounts to no more than a futile hope that rehabilitation is possible. *See Doe,* 871 F.2d at 1253; *United States v. E.K.,* 471 F.Supp. 924, 932 (D.Or.1979).

[T]he balance must be struck somewhere and somehow between providing a rehabilitative environment for young offenders as well as protecting society from violent and dangerous individuals and providing sanctions for anti-social acts.... It is incumbent upon the court to deny the motion to transfer where, all things considered, the juvenile has a realistic chance of rehabilitative potential in available treatment facili-

ties in the period of his minority.... However, where no realistic chance for rehabilitation exists, we have the clearest case where the balance does indeed tip in favor of bringing the philosophy of the criminal justice system into play.

*E.K.,* 471 F.Supp. at 932, *quoted in Doe,* 871 F.2d at 1253. *In re T.W.,* 652 F.Supp. 1440, 1445 (E.D.Wis.1987).

## III. THE "INTERESTS OF JUSTICE" FACTORS

### A. Age and Social Background

 The juvenile in this case is eighteen years old. He has lived his entire life with his mother, a substitute teacher in the Beaumont Independent School District. His mother appears to be the only potentially stabilizing figure in his life, and even her influences clearly have not held sway. M.H. lost his father several years ago as a result of a shooting.

The juvenile's educational background is not good. According to the testimony of various witnesses, M.H. has never been a distinguished student. By the time he reached eighth grade, he was referred to alternative school, an educational institution designed for students at risk, teen parents, students academically behind and students in trouble.

He dropped out of an alternative school during ninth grade after an extended string of absences. While at the alternative school, his performance ranged from adequate to less than exemplary. His behavior and performance became increasingly poor while at the school. A formerly polite, soft-spoken, well-behaved child, he turned into an unkempt, inattentive, and withdrawn student. M.H. admits he began using drugs regularly during this period of time. He never re-enrolled after dropping out.

M.H.'s brief work history is reflected in the record and in the testimony of Ruth Hall, Jefferson County Juvenile Probation Officer. M.H. worked on and off after school and on weekends during 1991–1992 at a family-owned recreational room in Newton. There-

after, M.H. voluntarily entered the Job Corps in late 1993. He participated for three months before being discharged from the program due to poor behavior.

M.H. informed Dr. Edward B. Gripon, M.D. P.A., during an examination on July 27, 1994 that he believed he was the father of a baby his girlfriend had recently had (he was unsure of the exact date of birth). M.H. was not sure whether he was the father, yet made no efforts to determine paternity. He was not even certain of the date of birth, and he had made no arrangements whatsoever to provide financial or emotional support to the child.

One year later he told Pretrial Services that he was not the father of any children. His failure to seem particularly concerned at the time of either interview with whether he is a father is indicative of unwillingness to take responsibility for his actions.

Shirley Broussard, a family friend familiar with M.H.'s social background, testified that it was her opinion that M.H. could be rehabilitated. She stated that she never felt threatened by M.H. in social situations, and further testified that she would be comfortable leaving her five-year-old child with him.

Because it appears that there is no additional guiding influence in M.H.'s home or among his peers to aid him in his rehabilitation, because there are indications that he has difficulty accepting responsibility for his actions, because he has not obtained a satisfactory level of education, because he labors under a disability of a drug habit, and because he expresses no desire to change, the social background factor cannot be considered to weigh in favor of rehabilitation or other treatment as a juvenile delinquent.

### B. The Nature of the Alleged Offense [1]

M.H. is charged with participating in seven armed robberies, most of them of fast food restaurants. In at least three of the robberies, guns were discharged. In one, a person was held against her will. In at least one other, a gun was placed against a victim's head. And most seriously, during the Pe-

---

1. For purposes of a transfer hearing, the court may assume the truth of the alleged offenses.

*Doe,* 871 F.2d at 1250 n. 1; *In re Sealed Case,* 893 F.2d 363, 369 (D.C.Cir.1990).

king restaurant robbery, one person was killed and another seriously wounded.

As to this incident, state felony charges are pending. M.H. has been certified to stand trial as an adult in state court on charges of attempted murder, attempted capital murder, and aggravated assault in connection with this robbery.

All appear to be well-timed, well-plotted affairs. The juveniles involved always made a point of covering their faces. They always struck at the same time—around closing time.

There appear to be no mitigating factors associated with these robberies. For example, the juvenile did not claim to have committed the offenses out of destitute poverty or under duress. Rather, they appear motivated out of mere maliciousness, selfish desire for monetary gain, or perhaps for recreation. Finally, the defendant has exhibited no remorse for his involvement in these incidents.

This factor does not reflect a realistic potential for rehabilitation and therefore weighs in favor of adult criminal punishment and protection of society.

## C. The Extent and Nature of the Juvenile's Prior Record

The court has reviewed records of Jefferson County and the First Judicial District (Jasper and Newton Counties). In addition, the court heard testimony from Lance Caraway, former Jasper County Juvenile Probation Officer, and Ruth Hall, Jefferson County Juvenile Probation Officer. Altogether, the evidence shows only one prior occasion for formal supervision. Nevertheless, the juvenile has a long record dating back to a time when he was just twelve years old. The record shows criminal episodes became more serious and more frequent with time, ultimately culminating in the string of seven armed robberies that are the subject of the present information. A quick synopsis of the juvenile's prior record illustrates his progression from a mere troublemaker to a career delinquent:

1. March 17, 1990—Arrested for shoplifting from a Target store. Charged with stealing three videogames and spray paint.

2. April 4, 1990—Assaulted a Beaumont schoolteacher who was trying to break up a fight. Hit her over the head with an unknown object and knocked her to the ground, where she was repeatedly kicked and her glasses were broken.

3. May 5, 1990—Stole M & M candies and Dorito chips from a student shop at Lamar University. After this incident, ordered to pay restitution for the March 17, 1990 and May 5, 1990 thefts. Placed under voluntary supervision for six months, which is a type of probation that is often recommended for juveniles in lieu of proceeding in court.

4. March 28, 1991—Picked up for burglarizing a residence and for unauthorized use of a vehicle.

5. August 9, 1993—Picked up for spray painting gang-related graffiti on several public housing projects.

6. October 4, 1993—Picked up for a disorderly conduct incident in which he harassed a police officer by shouting obscenities at him.

7. February 6, 1994—Picked up for a similar incident.

8. March 27, 1994—Arrested for unlawfully carrying a weapon and evading detention. Brandished a loaded gun in front of a police officer during this incident.

9. Finally, in addition to the seven charged armed robberies, one of which led to one person's death, there is evidence that this juvenile participated in two other uncharged armed robberies, one of a Church's Chicken in Beaumont and the other of a Church's Chicken in Port Arthur.

This obviously is not the record of an otherwise exemplary youth who commits an anomalistic digression. The extent and seriousness of this record render it highly doubtful that this juvenile could be successfully rehabilitated. Again, this factor weighs in favor of adult criminal prosecution and protection of society.

## D. Present Intellectual Development and Psychological Maturity

The court has reviewed records of examinations by Ray Coxe, Phd., a psychologist who conducted examinations on July 28, 1994 and February 8, 1995. The court also has reviewed reports of examinations by Dr. Edward B. Gripon, M.D. P.A., who conducted examinations on July 28, 1994, January 29, 1995, and August 1, 1995. The latter examination was pursuant to order of this court issued on August 2, 1995.

Dr. Gripon's examinations on January 29, 1995 and August 1, 1995 were abortive due to lack of cooperation from the juvenile. Based on his other examination, however, Dr. Gripon testified that the juvenile's intelligence level is within the dull to borderline range. These developmental limitations, absence of remorse, and fewer than three to five years remaining for M.H. to be detained in a federal juvenile rehabilitation program, render the prospects of his becoming fully rehabilitated very remote, in Dr. Gripon's opinion.

Nevertheless, M.H. is independent-minded and can take care of all of his nonfinancial needs on his own. He is quite "street smart." Dr. Gripon testified that M.H.'s IQ does fall within a range typically seen among adults involved with the criminal justice system. Finally, there is no evidence that M.H. has sought or received any mental health counseling or that he is suffering from any mental disorder.

The clinical findings of Dr. Coxe, clinical psychologist, are consistent with Dr. Gripon's evaluation. It may be significant that the juvenile's performance deteriorated after five months detention. That might indicate tactical gamesmanship or actual deterioration. In either instance, it does not bode well for rehabilitation.

As M.H. is capable of functioning intellectually and emotionally as an adult in some ways, but has limited intellectual and psychological potential for rehabilitation, this factor, too, points against proceeding as a juvenile.

## E. Nature of and Response to Past Treatment Efforts

The voluntary six months supervision program undertaken in 1990 was the only formal treatment program attempted with this juvenile. This program was not completed because M.H. moved to another county. In any event, M.H. was apparently not well suited for this program, and his infractions quickly became more serious.

One informal treatment that was attempted was a transfer in the eighth grade to an alternative school within the Beaumont school district. Elizabeth Richard, a guidance counselor at that school, testified that the school specializes in nurturing at risk children: those who have drug problems, those who are teen parents, those who have disciplinary problems, those who have persistent academic troubles, etc. When M.H. first came to this school, Ms. Richard was under the impression that he was making progress. However, as time passed, and particularly in the ninth grade, changes in his disposition began to manifest themselves. He became moody and withdrawn. He started to fall behind in his work, and his grades dropped sharply. He had several periods of extended absence. He would sleep through classes and often appeared unkempt. Finally, M.H. simply dropped out.

At present, he is too old to qualify for any alternative programs offered by the Beaumont school district. The Court takes note of Ms. Richard's earnest testimony that, in her opinion, M.H. could be rehabilitated. It should be noted, however, that Ms. Richard had not seen M.H. (other than for her court appearance) since early 1993, well before the charged offenses were committed.[2]

Analysis of this factor reflects no realistic potential for rehabilitation. Therefore, this factor points against proceeding as a juvenile.

## F. Availability of Treatment Programs to Treat Behavioral Problems

The government presented the testimony of Ken Laborde, a probation officer in the Eastern District of Texas. He testified that

2. The first of the seven charged robberies oc- curred on April 1, 1994.

due to the relatively low number of juveniles in the federal criminal justice system, the federal government does not itself run any treatment programs for juveniles, but rather contracts with outside agencies to provide treatment services. He estimated that there are probably only between 100 and 125 juvenile treatment programs under contract with the federal government in the entire country. He further testified that, for a number of reasons, M.H.'s chance of gaining admittance to such a program is very slight. Most programs have age limits, and the juvenile is already 18. Many refuse to accept juveniles with violent backgrounds. Most have waiting lists. Finally, many of these programs define their mission very narrowly and accept only a very specific type of applicant.

Further, there is little chance that the juvenile will be able to obtain treatment services through the state. He is currently being prosecuted for murder. Because he is being tried as an adult and because of his age, he no longer qualifies for state programs.

█ This factor should not weigh against the juvenile solely because the government fails to offer a treatment program. Conversely, the government's default in making available a wide range of programs is insufficient reason to conclude this factor in the juvenile's favor. Under this circumstance, the court appropriately may consider the likely success of such a rehabilitative program were one available.

There are numerous indications in the record that this juvenile has a problem with authority figures, such as the assault on the schoolteacher in 1990 and the 1993 and 1994 harassment incidents with police officers. Additionally, the juvenile has a history of not following through at school or in the Job Corps. Finally, the court finds the one reported rehabilitative effort—the alternative school—to be instructive. Be it a want of motivation or some other reason, M.H. failed to make the most of the alternatives this program offered him. There is no indication that M.H. would approach any other program differently.

## IV. CONCLUSION

As stated at the outset, it is incumbent on the court to deny the motion to transfer when, all things considered, the juvenile has a realistic chance of rehabilitative potential in available treatment facilities in the period of his minority. Here, however, there is at best only a glimmer of hope that rehabilitation is possible. The court should have more than a mere glimmer of hope before determining that interests of justice favor non-criminal treatment as a juvenile delinquent. *Doe*, 871 F.2d at 1253; *United States v. Alexander*, 695 F.2d 398, 401 (9th Cir.1982). Here, all six interest-of-justice factors weigh in favor of granting the government's motion to transfer to adult status.

## V. RECOMMENDATION

Evidence has been received and findings have been made on all six factors and a recommendation can now be made on the motion. *Cf. United States v. C.G.*, 736 F.2d 1474 (11th Cir.1984) (failure of district court to make findings with respect to two prongs justified remand for further findings). Because the factors on balance compel the conclusion that a transfer to adult status would be in the interests of justice, it is hereby recommended that the government's motion to transfer proceedings against this juvenile to an adult prosecution be granted.

## VI. OBJECTIONS

Within ten (10) days after receipt of the magistrate judge's report, any party may serve and file written objections to the findings and recommendations of the magistrate judge. 28 U.S.C. § 636(b)(1)(C).

Failure to file written objections to the proposed findings and recommendations contained in this report within ten days after service shall bar an aggrieved party from *de novo* review by the district court of the proposed findings and recommendations and from appellate review of factual findings accepted or adopted by the district court except on grounds of plain error or manifest injustice. *Thomas v. Arn*, 474 U.S. 140, 148, 106 S.Ct. 466, 471, 88 L.Ed.2d 435 (1985);

*Rodriguez v. Bowen,* 857 F.2d 275, 276–277 (5th Cir.1988).

Signed this 15 day of August, 1995.