**UNITED STATES of America,**

v.

**Lemrick NELSON, Jr., Defendant.**

**No. CR–94–0823 (DGT).**

United States District Court,
E.D. New York.

March 21, 1996.

Zachary W. Carter, United States Attorney, Eastern District of New York, Brooklyn, NY, for Plaintiff.

Christine E. Yaris, New York City, Trevor Headley, Brooklyn, New York, for Defendant.

## MEMORANDUM AND ORDER

TRAGER, District Judge:

The government has moved to transfer the defendant, Lemrick Nelson, to adult status. I previously decided that the defendant should be tried as a juvenile. The government appealed, and the Second Circuit remanded the case for reconsideration of the motion. *United States v. Lemrick Nelson,* 68 F.3d 583 (2d Cir.1995).

### Background

#### (1)

On August 10, 1994, the United States Attorney for the Eastern District of New York filed a Juvenile Information charging Nelson with an act of juvenile delinquency on August 19, 1991. Specifically, Nelson was charged with using force on and wilfully injuring or attempting to injure Yankel Rosenbaum, an Orthodox Jew, because of his religion and because he was enjoying facilities provided and administered by the City of New York, namely the public streets, result-

ing in Rosenbaum's bodily injury and death. The Information cites 18 U.S.C. § 245(b)(2)(B) which imposes criminal penalties for civil rights violations involving interference with federally protected activities and 18 U.S.C. §§ 5031–5042 providing for juvenile proceedings in district courts.

Title 18 United States Code §§ 5031–5042 evinces a strong presumption that a person charged with committing certain enumerated offenses while under the age of eighteen shall be proceeded against as a juvenile. *United States v. Juvenile Male # 1,* 47 F.3d 68, 70 (2d Cir.1995) ("Juvenile adjudication is presumed appropriate unless the government establishes that prosecution as an adult is warranted."); *United States v. A.R.,* 38 F.3d 699, 706 (3d Cir.1994) ("The statute clearly intends a presumption of juvenile treatment, and the government bears the burden of establishing that transfer is warranted."); *United States v. Parker,* 956 F.2d 169 (8th Cir.1992), *cert. denied, Potter v. U.S.,* — U.S. ——, 114 S.Ct. 146, 126 L.Ed.2d 108 (1993); *United States v. M.L.,* 811 F.Supp. 491 (C.D.Cal.1992). Title 18 United States Code Section 5032 ¶ 1 specifically provides:

> A juvenile alleged to have committed an act of juvenile delinquency ... shall not be proceeded against in any court of the United States unless the Attorney General, after investigation, certifies to the appropriate district court of the United States that (1) the juvenile court or other appropriate court of a state does not have jurisdiction or refuses to assume jurisdiction ... (2) the State does not have available programs and services adequate for the needs of juveniles or (3) the offense charged is a crime of violence that is a felony or an offense described in §§ 841, 952(a), 955 or 959 of Title 21, and that there is a substantial federal interest in the case or the offense to warrant the exercise of federal jurisdiction....

In situations such as the one before this court, federal jurisdiction exists because the federal government has a substantial interest in the case. 18 U.S.C. § 5032 ¶ 1(3). Upon finding jurisdiction, a hearing must be held to determine if transferring the defendant to adult status is in the interest of justice. Only upon making such a finding may the government proceed against that person as an adult. 18 U.S.C. § 5032 ¶ 5.

In order to make such a determination, the statute directs that a district court consider and make findings with respect to each of the following six factors: (1) the juvenile's age and social background, (2) the nature of the alleged offense, (3) the extent and nature of the juvenile's prior delinquency record, (4) the juvenile's intellectual development and psychological maturity, (5) the nature and success of past treatment efforts, and (6) the availability of programs to treat juveniles' behavioral problems. 18 U.S.C. § 5032 ¶ 6. I began its review of these factors at a hearing held on March 30, 1995. That hearing was adjourned to April 12, 1995 at which time I determined that Nelson should be tried as a juvenile. On an appeal by the government, on October 17, 1995, the Second Circuit remanded for reconsideration. The defendant's request for an en banc rehearing was denied. On February 8, 1996, this court conducted an additional hearing focusing on Nelson's intellectual development and psychological maturity, the availability of programs for a juvenile older than twenty years of age, as well as his potential for rehabilitation.

### (2)

Nelson was born on July 31, 1975. He was 16 years and 3 weeks of age at the time of the incident, 19 years of age at the time the Information was filed, and presently is 20½ years old. Prior to his arrest at the event subject to the Information, Nelson had no criminal record. However, since his arrest in 1991, Nelson has pled guilty, as an adult, in Georgia state court, Dekalb County, to aggravated assault and carrying a concealed weapon. Specifically, Nelson pled guilty to aggravated assault for cutting the victim's jacket and skin with a razor blade on January 14, 1994 and carrying a concealed weapon, a scalpel, on March 5, 1994. Gov't Ex. 5. In addition, on June 23, 1995, Nelson was charged with resisting arrest while allegedly smoking marijuana, Gov't Ex. 7, and, furthermore, was arrested approximately ninety

minutes after leaving this court on February 8, 1996, for criminal trespass in which he allegedly would not leave the lobby of a building, which was not his residence, and was carrying a box cutter. Nelson has not been tried, nor has he pled guilty to either of these charges.

Two psychologists interviewed and tested Nelson in November 1994, submitted reports in December 1994 and then testified at the hearing on February 8, 1996. The government's expert, Dr. Naftali Berrill, directs the New York Forensic Mental Health Group, which is a private practice that, according to Dr. Berrill, "sees a wide range of patients for both treatment and diagnostic work-ups. With respect to treatment, often we see people who are either offenders [or] probationers. We also see victims of violence or family members of victims of violence." Hearing Tr. at 4–5. From 1988 to 1991, Berrill was the director and chief psychiatrist at Bronx Family Court in which he managed the clinic and provided direct service to individuals in delinquency, felony, neglect, and abuse cases. *Id.* at 8. The United States Department of Probation and Pre–Trial Services often sends people to Dr. Berrill's practice. Hearing Tr. at 4–5.

The defendant's expert, Dr. Ife Landsmark, is in private practice serving children, adolescents, couples and families. She also works as a consultant serving community-based agencies in Brooklyn and Manhattan that work with children in foster care. Hearing Tr. at 158–59. She counsels those children and families, trains social workers. and other clinicians and performs psychological testing "to determine the needs of the child and how these needs may be best served." *Id.* at 159. Both her training and her practice focus on serving children through young adults. *Id.* at 160. Significantly, for at least six years, Landsmark worked as the clinical director of residential treatment centers which housed and treated conduct-disorder children who could not be rehabilitated in the community. Hearing Tr. at 163; Resume of Ife A. Landsmark.

The results of the various tests administered by the doctors were generally consistent. Both Dr. Berrill and Dr. Landsmark found that Nelson has a low average to average I.Q. Berrill's Report at 12; Landsmark's Report at 5. Somewhat more elaborately, Dr. Landsmark explained that she administered a series of intelligence tests from which she deduced that while his cognitive abilities are average and his verbal intelligence and reasoning are below average, on a language-free exam, measuring abstract/figural problem solving, his score falls within the high average range. Landsmark's Report at 5.

Dr. Landsmark further testified that Nelson was raised in an unstable family and social environment. His mother had suffered from severe emotional problems from the time of his birth. Landsmark's Report at 2–4. Also, Nelson had difficulty in school. School records show that he was identified as "a youngster at risk by the end of the fourth grade." Landsmark's Report at 2. At the end of the seventh grade he was suspended for bringing a toy gun to class and subsequently was placed in special education. *Id.* Academic underachievement was evident throughout his schooling with complaints of classroom disruption and poor motivation. Interpersonal relationships with peers and adults were also "poor and impulsively driven." *Id.* Both Dr. Landsmark and Dr. Berrill agreed that his school behavior demonstrates Nelson suffers from a "conduct disorder;" they also agreed that he does not suffer from any significant psychopathology. Berrill's Report at 15; Hearing Tr. at 19–22; Landsmark's Testimony at 186, 211.

Despite these agreements, the doctors' opinions varied significantly in their interpretation of many of the test results and their other studies. For example, Dr. Berrill found that Nelson is functioning as a young adult because he was able to achieve a modicum of independence—he lived in Georgia without his family, paid for an apartment on his own, worked, and had goals for the future. Berrill's Report at 16. On the other hand, Dr. Landsmark found that Nelson is functioning as an adolescent and not an adult. According to Dr. Landsmark, "[h]is attempt to cope with unmet dependency needs has led to their denial and to the

development of a sense of self-reliance that is inflated and tends towards grandiosity." *Id.* In other words, she explained that she views Nelson's ability to live on his own in Georgia as a survival skill as a result of his home environment rather than a sign of maturity. Hearing Tr. at 245. She noted that he did not want to go to Georgia, but rather was sent there by his family. *Id.* Dr. Landsmark determined that Nelson has a "child's perception of his world" in which he vastly oversimplifies matters. Hearing Tr. at 242.

In Dr. Berrill's report, he concluded that Nelson has many "anti-social features," but not an anti-social disorder. Berrill's Report at 13. Dr. Landsmark's report similarly concluded that: "[n]one of the psychometric instruments employed [by her] suggest strong anti-social tendencies." Landsmark's Report at 7. At the February 8, 1996 hearing, however, Dr. Berrill on cross-examination stated that "he might readily change [his opinion that Nelson did not have an anti-social disorder] at this point in time given the information I have available [concerning the Georgia conviction]." Hearing Tr. at 91. He also explained, on cross examination, that determining whether the anti-social features exhibited by Nelson constituted an anti-social disorder "was a close call for me. I have to say I went back and forth making the full diagnosis ... at the time I did the workup, certain information was not available that is now with respect to the Georgia case, which changed my mind about the diagnosis." Hearing Tr. at 49. Dr. Landsmark disputed Dr. Berrill's conclusion at the hearing that Nelson exhibited anti-social personality disorder while acknowledging that Nelson displayed anti-social tendencies. "The difference is degree." Hearing Tr. at 186.

At the hearing, Dr. Berrill reviewed the seven factors or features for establishing an anti-social personality disorder diagnosis according to the Diagnostic Statistical Manual, Fourth Edition (DSM–IV). In order to be diagnosed with anti-social personality disorder, one must exhibit at least three of these features. In addition, one must have a conduct disorder as a child which both Dr. Berrill and Dr. Landsmark found to exist.

Hearing Tr. at 20; 223. In Dr. Landsmark's testimony, she reviewed the same criteria and explained how she reached the conclusion that Nelson did not have an anti-social personality disorder.

One feature to be considered in determining whether one has the disorder is "failure to conform to social norms with respect to lawful behavior as indicated by repeatedly performing acts that are grounds for arrest." DSM–IV at 649. Dr. Berrill explained that "to my knowledge, Mr. Nelson has certainly been arrested a number of times and has failed to conform his behavior."[1] Hearing Tr. at 23. Dr. Landsmark agreed that this feature is present. *Id.* at 187.

A second feature characteristic of an anti-social disorder is "deceitfulness as indicated by repeated lying, use of alias, conning others for personal profit or pleasure." DSM–IV at 650. Dr. Berrill believed Nelson exhibits this characteristic as well stating: "one can construe the kind of information that he provided to me during my interview with him [as] a certain degree of deceitfulness. [For example,] ... during my interview with him, he simply states that he's clearly not guilty of the charges [in Georgia], he would never hurt anybody, he would never engage in this violent behavior." Hearing Tr. at 23. Dr. Landsmark took issue with Dr. Berrill's assessment of Nelson as deceitful. She explained that simply denying events in one's life does not amount to being deceitful. She stated that on most of the tests he was given by both of them, including the Minnesota Multiphasic Personality Inventory (MMPI2), the Jesness Inventory of Adolescent Personality, and the Carlson Psychological Survey, questions are asked to determine if the individual is deceitful. She concluded from the results of a multitude of tests that this feature is not present. Hearing Tr. at 188. She maintained that for the purposes of this feature deceitfulness meant "conning others for personal profit or pleasure," which she did not find. Hearing Tr. at 229.

She further explained that she interpreted the denial of guilt in Georgia quite differently from Dr. Berrill. She saw that event as a

---

1. Berrill noted that he considered his pleas in Georgia in his determination. Hearing Tr. at 23.

typical school fight which turned violent. To her, it demonstrated psychological immaturity not deceitfulness. She held that the motive of the individual, rather than the truthfulness of his/her statement, should be the overriding factor in determining deceitfulness.

> [I]n my field, children defend themselves. The most primitive way of defending yourself is to say "I didn't do it.". . . [T]he first thing [that one employs] is denial . . . That's a mechanism of defense. I'm not going to get caught up in real life whether this is true or not true. Rather, what is the intent of a child with me? Is he telling me his vision of the world as he sees it or is it his intent to create something that he thinks I want to hear? . . . Again, one incident does not deceitfulness make. It's the total picture. Hearing Tr. at 227.

A third feature is "impulsivity, failure to plan ahead." DSM–IV at 650. Dr. Berrill did not focus on this feature stating obscurely "one might question that." Hearing Tr. at 23. Dr. Landsmark did not find impulsivity in Nelson. "[Nelson] plans ahead. It is a matter of whether it is mature planning ahead." *Id.* at 191. She explained that Nelson said he wants to go to college and become an electrical engineer—according to Dr. Landsmark, that is planning ahead even if it may not be realistic. *Id.*

A fourth feature is "irritability and aggressiveness, as indicated by repeated fights or assaults." DSM–IV at 650. Dr. Berrill determined that because a number of arrests have occurred in the last few years, one of which clearly entailed an assault, Nelson's behavior fits this category. Dr. Landsmark, however, maintained that, while Nelson can be aggressive, she did not find such conduct pervasive, which is a prerequisite to find the fourth feature present. Hearing Tr. at 233. She focused on the fact that although there were "conduct disorders" noted in Nelson's school records, prior to the event charged in the Information, Nelson had no criminal record. *Id.* at 192. She explained that prior to the 1991 incident, Nelson's "conduct disorders" were not so severe that he would have been placed in one of the residential treatment centers she had run where the popula-

tion was of conduct disordered individuals of Nelson's age. His behavior had not merited such action. *Id.*

The fifth feature "reckless disregard for the safety of self or others," DSM–IV at 650, Dr. Berrill found satisfied by the Georgia incident. Hearing Tr. at 25. Berrill's specific statement was less firm: "[S]omeone can argue that's something that would need to be considered." Hearing Tr. at 25. Dr. Landsmark did not find this feature present, explaining on cross-examination that the degree to which it is necessary to be found for an anti-social disorder had not been demonstrated. *Id.* at 234. Again, she emphasized that one or even a limited number of instances of the feature was not sufficient to constitute a feature for diagnosing anti-social personality disorder. *Id.* at 235.

Dr. Berrill did not discuss the sixth feature: "consistent irresponsibility, as indicated by repeated failure to sustain consistent work behavior or honor financial obligations." DSM–IV at 650. Dr. Landsmark noted that Nelson had a job in Georgia and that he is employed in New York presently. Thus, it would appear uncontradicted that Nelson does not exhibit the characteristics of this feature. *Id.* at 193–94.

The seventh feature in diagnosing anti-social personality disorder is "lack of remorse, as indicated by being indifferent to or rationalize having hurt, mistreated, or stolen from another." DSM–IV at 650. Dr. Berrill explained that, in discussing the events in Georgia, "one had a sense . . . that [Nelson felt that he] was the victim of that situation, he was the victim of the federal government, the court system, whomever, but there was no indication, at any time, that he felt remorse or felt any kind of empathy for somebody who had been cut . . . with a razor blade." Hearing Tr. at 24. Dr. Landsmark refuted this, stating: "He certainly does rationalize. He'll explain himself or try to, when you push him. But lack of remorse, no that wasn't there." *Id.* at 194. She further explained:

> To see if there is any remorse, I deliberately loaded the words that have to do with harm [summarizing how one person is dead and one is injured and he does not

have the same friends as he used to]. He cried. Now, his tears were also self-pitying. They were around what he lost as well as this helpless [situation]. . . . Now, for an adolescent young, adult male to cry in front of anybody is tricky. To cry in front of a female is trickier . . . Hearing Tr. at 195–96.

Thus, after reviewing all seven features comprising anti-social disorder, Dr. Berrill apparently found five of them present. However, it is significant that on direct examination, he never classified Nelson as having the disorder; only on cross-examination did he so diagnose Nelson. On a second occasion, he was even equivocal on this issue. Hearing Tr. at 49, 91. Dr. Landsmark, however, found only two features present, thus concluding that Nelson does not suffer from this disorder.

The two doctors also administered a series of personality exams to Nelson. While the doctors did not give Nelson the identical tests, Dr. Landsmark stated at the hearing that the tests she chose were comparable to Dr. Berrill's exams. Hearing Tr. at 169–70.

Dr. Berrill gave Nelson the Minnesota Multiphasic Personality Inventory (MMPI2) exam. The MMPI2 is a personality inventory consisting of approximately five-hundred and sixty true false questions. After answering the series of questions, the answers are "graded" by a computer which has a large database to compare answers of others. According to Dr. Berrill, "[s]cientific research has shown that various questions . . . correlate together very nice[ly] to form certain kinds of things that we describe as basic factors, and a factor is, for example, depression . . . so items X, Y, and Z, when put together in concert, represent the extent to which an individual might be depressed." Hearing Tr. at 26–27. Dr. Berrill maintained that the results of the MMPI2 confirm the presence of anti-social features in his personality. Hearing Tr. at 25–26.

Dr. Berrill also administered the Jesness Inventory of Adolescent Personality test. This exam assesses the individual's need for treatment at a correctional facility and what programs are required in order to rehabilitate the individual. Hearing Tr. at 41. The test is scored by a computer which compares the answers of the defendant with a delinquent youthful offender population. Hearing Tr. at 41. The results of the test confirmed Dr. Berrill's findings that Nelson is group oriented, that he blames others for his own problems, and that he is from a deprived home and a neighborhood of low economic status. Further, the Jesness suggests the typical post-release behavior for each type of individual. In this instance, Jesness predicts that a person with test results like Nelson has a "below average probability of success; tendency toward violent crime."[2] Gov't Ex. 4 at 3.

In the conclusion of his report, Dr. Berrill noted that Nelson has "a need for social approval and commendation" and that "[c]riticism by authority figures such as parents or teachers causes him considerable pain and humiliation. By acting in an accommodating and overly respectful manner he hopes to avoid disapproval especially from those he judges to be important." Berrill's Report at 14. "At times of stress and/or in the context of associating with peers, Mr. Nelson['s] allegiances turn to the group as a source of support and validation as he is someone who tends not to be introspective and/or engage in self-examination when he is involved with problems. Further, he tends to externalize blame." *Id.* at 16.

In summary, Dr. Berrill's report concluded "while there was no evidence in this examination to suggest that Mr. Nelson actively endorses predatory and/or violent behavior, it would seem that his alliance to his peer group and tendency to externalize blame presents the requisite conditions for anti-social acting-out at times of significant stress and/or social reinforcement by his peers."[3] Berrill's Report at 16.

2. This prediction is a bit unclear as Dr. Berrill never defined what "average probability of success" is.

3. Both Dr. Berrill and Dr. Landsmark tested Nelson in November 1994, prior to his pleading guilty to the Georgia offenses.

Dr. Berrill predicted that "[i]t is possible, however, that he might benefit from being involved in a group counseling/therapy setting where pro-social behavior and attitudes can be encouraged and anti-social beliefs can be further explored and challenged by both therapist and group members." Berrill's Report at 17. In fact, at the February 8, 1996 hearing, Dr. Berrill testified that in order for group counseling to be effective, Nelson must be with people his age or older. Hearing Tr. at 43. Nevertheless, Dr. Berrill maintained that the prospect of rehabilitating Nelson was "guarded." Tr. at 39.

One of the personality tests that Dr. Landsmark administered was the Carlson test which closely approximates the Jesness exam. "The population that it was normed on was an adult prison population." Hearing Tr. at 198. By comparing Nelson's results to the norm, Nelson was determined to be a Type 4 personality. *Id.* at 199. A type 4 individual is defined as immature, having poor judgment, and restless. *Id.* The test results also seek to predict recidivism. In a four-year post-release study, thirty-three percent of those tested were found not to have been reconvicted. *Id.* at 200.

Dr. Landsmark agreed with Dr. Berrill that Nelson deeply cares about what people think about him. Hearing Tr. at 210. Dr. Landsmark stated in her report that: "There is significant, although not pathological, blunting of affective awareness ... with increasing stress one is likely to see an elevated mood of expansiveness and grandiosity, higher activity levels and impulsive acting out behaviors." Landsmark's Report at 7.

Dr. Landsmark stated that she tended to be conservative about one's ability to be rehabilitated. Hearing Tr. at 211. She believed that Nelson needed a supportive environment, reading and listening skills, and therapy. *Id.* at 202–03. Dr. Landsmark predicted that treatment can help Nelson. *Id.* at 215–16. While Dr. Landsmark's report stated that "it [is] likely that he would initially reject treatment interventions," Landsmark's Report at 7, he would participate if required to do so. Hearing Tr. at 215. She also noted that time had passed and additional criminal behavior has occurred

from the time she had evaluated him in November 1994, but "at the time she met with him, his prognosis [for rehabilitation] was good." Hearing Tr. at 211–12. She found his subsequent acts consistent with her diagnosis. Hearing Tr. at 248. On cross examination, she said, that even with the events that occurred after her meeting with him, she would not change her original prognosis, noting that no rehabilitative treatment had been undertaken during the period since her report. *Id.*

### (3)

Upon remand, the Second Circuit gave a few specific instructions upon remand. First, the Second Circuit instructed this court to consider Nelson's current age with regard to how he "would fit into a program for the rehabilitation of juvenile delinquents." *United States v. Lemrick Nelson,* 68 F.3d 583, 589 (2d Cir.1995). Second, the Second Circuit instructed this court "simply to assume that, for the purposes of the transfer hearing, the juvenile committed the offense charged in the Information." *Id.* Thus, review of the federal homicide statute was not appropriate. Third, the Second Circuit required this court to reconsider Nelson's convictions in Georgia when determining the prospects of rehabilitation, stating that although the district court said that it was considering those convictions as relevant to rehabilitation, "if that is so, the [district] court erred in how it applied the prospects of rehabilitation in relation to the fifth factor [the nature of past treatment efforts and the juvenile's response to such efforts]." *United States v. Lemrick Nelson,* 68 F.3d at 590. Furthermore, the Second Circuit rejected the use of the "glimmer of hope" test as the legal standard for the prospects of rehabilitation. *Id.* at 590. In addition, the Second Circuit noted: "The six statutory factors need not be accorded equal weight by the district court, which may balance the factors in any way that seems appropriate to it." *Id.* Lastly, the Second Circuit stated: "We think that it is important in this case for the district court to make an inquiry into juvenile programs available and as to how Nelson, at twenty years of age, would fit into such programs

and how much time he would serve as a juvenile." *Id.* at 591.

## Discussion

At the outset, based on the requirements of 18 U.S.C. § 5032 and the instructions of the Second Circuit, I will now review each of the six statutory factors.

### (1) Seriousness of the Offense Charged

■ One factor to be considered is the nature of the alleged offense. As stated at the first hearing, there is no question of the seriousness of the alleged offense. Hearing Tr. on 4/12/95 at 27. The Information charges a crime of violence and hatred which caused someone's death. Consequently, this factor strongly favors transfer to adult status.

### (2) Age and Social Background

■ As previously mentioned, Nelson was sixteen at the time of the incident, nineteen at the time the government brought this case against him, and presently is twenty and one-half years of age. Further, Nelson had a difficult upbringing including an unsupportive family and difficulty in school. As will be discussed in more detail in section (4), *infra,* Dr. Berrill found that Nelson is psychologically an adult, while Dr. Landsmark maintained that he is psychologically only an adolescent.

Significantly, although both psychologists made their reports when Nelson was already nineteen, neither psychologist, despite their differing conclusions on a number of important issues, focused on Nelson's age alone as critical in determining the potential for rehabilitation. Indeed, a later onset of anti-social conduct may be indicative of a greater potential for rehabilitation. Moreover, not only did both psychologists believe that the age of onset of anti-social features more relevant, but also the entrenched pattern of anti-social conduct and the opportunity for treatment, or the lack of it, were far more relevant to defendant's potential for rehabilitation than defendant's age *per se.* Thus, Dr. Landsmark testified at the February 8 hearing that:

There's a kind of popular notion, the younger you are you're more open, the older,

we are stuck in our ways. It's a little more complex in regard to literature. In being stuck on delinquency, we find that when an individual has begun a career of criminality and that career began at a very young age [she later defines this to mean 12 or 13] ... that person, apparently, has a poorer prognosis than an individual who is in late adolescence [which she later defined as 15–17] at the time of the first criminal arrest.

On the other hand, ... the literature also suggests that [if] you take that 12 or 13 year old and you help him grow in the correct way, then his chances of remediation and rehabilitation are good. That's where the idea of catching them while they are young comes from. Hearing Tr. at 205–06.

Similarly, as Dr. Berrill testified, when asked how a defendant's age factors into the rehabilitative process:

the older you get the more difficult it is to treat. Presumably, based on the notion that there is recidivism. If it's a one shot deal, if one person has committed an act, a violent act or what have you, perhaps that might be an isolated act. If there's a pattern of disruptive behavior culminating in adulthood, the prognosis has to be guarded.... *[L]iterature shows if it's an isolated act of adolescence, you may have, with proper support and treatment, you may have better outcome.* However, if the onset is earlier, if the behavior is quite entrenched and there are now years of ... acting out, shall we say in a violent or aggressive or conduct disorder fashion, then certainly it makes it more difficult to treat an adult. Hearing Tr. at 39–40 (emphasis added).

The incident here was the first time Nelson was charged in a criminal matter. Moreover, the defendant has yet to receive any rehabilitative treatment. This case is, therefore, unlike *United States v. Doe,* 871 F.2d 1248 (5th Cir.), *cert. denied,* 493 U.S. 917, 110 S.Ct. 276, 107 L.Ed.2d 257 (1989), where many past rehabilitative efforts had proved futile, and more like *United States v. Juvenile Male # 1,* 47 F.3d 68 (2d Cir.1995). Consequently, the notion that because Nel-

son is almost twenty-one, rehabilitation is unlikely, cannot be viewed as well-based in light of the testimony of both experts.

Nelson's social background, the late age of the onset of his anti-social conduct, and the fact that no serious treatment was ever undertaken all support the conclusion that this factor favors treating Nelson as a juvenile.

### (3) Prior Record of Defendant

In light of both Dr. Landsmark's and Dr. Berrill's reports, Berrill's Report at 15–17, Landsmark's Report at 6–7, the third factor, the extent and nature of defendant's prior record, clearly favors Nelson remaining as a juvenile. Prior to this event charged in the Information, Nelson had no criminal record. His school record, while indicating a child with a conduct disorder, is not the same as evidence of a student with a serious anti-social disorder. His subsequent convictions and arrests will be discussed later in determining the prospects of rehabilitation.

### (4) Intellectual Development and Psychological Maturity

The fourth factor, intellectual development and psychological maturity, was extensively discussed in the transfer hearings. Both psychologists agreed that Nelson has a low average to average level of intelligence although, as noted, Dr. Landsmark indicated that his potential was greater, but adversely affected by his communication difficulties. Berrill's Report at 12; Landsmark's Report at 5. The government's psychologist, Dr. Berrill, maintained that Nelson has the maturity of a young adult, while the defendant's psychologist, Dr. Landsmark, concluded that he has the maturity of an adolescent. Both psychologists found that Nelson blamed others for any problems in his life. Dr. Landsmark found that Nelson "is an emotionally constricted and guarded young man, who perceives his world as threatening." Landsmark's Report at 6. Significantly, both psychologists agree that the defendant does not have a psychopathology, Hearing Tr. at 211,

and both maintain that Nelson might benefit from group therapy. Berrill's Report at 17; Hearing Tr. at 201–02.

In evaluating the two experts' testimony, I find that, where there are differences in findings and conclusions, Dr. Landsmark's testimony is more convincing. Dr. Landsmark appears to have had more experience working with conduct disordered youth whose backgrounds are similar to Nelson's. Also, Nelson was more cooperative with Dr. Landsmark than Dr. Berrill—answering questions for her that he did not answer for Dr. Berrill.[4] Another noteworthy difference is that Dr. Landsmark met with Nelson's parents while Dr. Berrill did not, and thus had a more complete picture of defendant's family and social background than Dr. Berrill.

In addition, in contrast to Dr. Berrill's testimony, which was often general, bordering on the conclusory, Dr. Landsmark's testimony was fuller, more detailed, specific and concrete. She nearly always supported her conclusions with examples from Nelson's family situation or answers that Nelson had given her. Conversely, although certainly informative and in many respects reliable, Dr. Berrill's testimony appeared to this court to be rather abstract. He often gave explanations that appeared to be applicable to any person with Nelson's family and social background, rarely if ever tying it to Nelson's particular personal history. Perhaps, because Dr. Landsmark spoke to Nelson's parents, she was able to refer to particular circumstances in the defendant's family history. In any case, Dr. Berrill often only related one event or instance to support major contentions. For instance, in describing why he believed Nelson has the maturity of an adult, he focused upon his ability to pay rent, find and keep a job, and engage in responsible sexual activity. Hearing Tr. at 17–18. Dr. Landsmark refuted this major premise of Dr. Berrill's analysis by describing that most individuals that she treats who

---

4. Although Nelson's counsel attempted to attribute this to the race of the psychologists, Hearing Tr. at 91–92, I believe the difference resulted from a combination of Dr. Landsmark's specific experience and acumen as a result of working

with troubled youth as well as Nelson's recognition that Dr. Landsmark was working for the defense, while Dr. Berrill had been hired on behalf of the government.

came from backgrounds similar to Nelson can, when forced to, live on their own for short periods. Hearing Tr. at 246. She stated that such factors demonstrate a survival mechanism in these youth and not psychological maturity.

Moreover, on the critical issue of whether Nelson had an anti-social disorder or merely anti-social tendencies, Dr. Berrill's testimony struck me as hesitant. Significantly, on both direct and re-direct examination, he was not specifically asked whether Nelson has this disorder. Only by inference could this conclusion be drawn. On cross examination, when he was twice asked directly for a conclusion, he explained that when he made his diagnosis in the report, stating that Nelson only had anti-social features, it was a "close call," but that his opinion of Nelson had changed with the new information about the incident in Georgia. Hearing Tr. at 49. If the subsequent event was so significant, one would have expected a firmer opinion on direct. Also, when the issue was posed a second time, his answer was still quite qualified. He "might readily change [his mind] at this point in time given the information [he] ha[s] available." Hearing Tr. at 91.

On the other hand, Dr. Landsmark's opinion was not only less qualified, but, as explained above, more persuasive. Moreover, Nelson's two recent interactions with the police are more indicative of juvenile behavior than serious criminal activities. Considering the seriousness of the situation, one would expect that the defendant, who in his view is being harassed by the police, would still do everything possible to avoid confrontations with law enforcement personnel. I find that even at the age of twenty, Nelson reveals the personality and intellectual development of a juvenile. Thus, this factor would also tend to favor treating Nelson as a juvenile.

### (5) Availability of Programs

■ Based on the testimony of Ms. Ansley Schmidt at the February 8, 1996 hearing, I find that an appropriate program to treat a twenty-one year old convicted as a juvenile crime exists. Ms. Schmidt made clear that two secure California Youth Authority facilities with juvenile programs allow individuals, who are older than eighteen but were con-

victed under juvenile statutes, to remain in their programs. Hearing Tr. at 107. She pointed out that neither program had any twenty-five year olds, but both had inmates that were twenty to twenty-four. Hearing Tr. at 109, 111. She explained that California juvenile facilities have no jurisdiction over twenty-five year olds. Hearing Tr. at 155. She also described over-crowding in these prisons as well as the vocational and educational programs available for a minimal number of the inmates. Hearing Tr. at 108–10.

■ Most significantly and surprisingly, Schmidt further explained that it is the Bureau of Prison's policy to place an individual, who is twenty-one or older, in one of eighty-one Bureau of Prisons facilities rather than a juvenile facility, even if he or she is convicted as a juvenile in federal court. Hearing Tr. at 115. This policy, according to the Bureau of Prisons, does not violate the provisions of 18 U.S.C. § 5039 which provides: "No juvenile committed to the custody of the Attorney General may be placed or retained in an adult jail or correctional institution which he has regular contact with adults incarcerated . . ." The Bureau relies on section 5031 of Title 18 which defines a juvenile as a "person who has not attained his eighteenth birthday" to justify this policy. Thus, it seems that anyone over eighteen, according to the Bureau of Prisons' interpretation of the Juvenile Delinquency Act, can be placed in an adult facility, although, in accordance with a policy described by Ms. Schmidt, only juvenile offenders who are over twenty-one when convicted are placed in adult facilities. Hearing Tr. at 132–33. This court was not aware of this policy when it made its first determination of whether to transfer Nelson to adult status. This court had assumed that those convicted under the Juvenile Delinquency Act could not be placed in adult institutions. It appears that the Second Circuit, too, was operating on the assumption that one convicted as a juvenile delinquent could not be placed with adults. *See United States v. Lemrick Nelson,* 68 F.3d at 588, 590–91. But now, after considering Schmidt's testimony, there is no question that Nelson, even if convicted under the Ju-

venile Justice and Delinquency Prevention Act, and over the age of twenty-one at the time of conviction, can be placed in an appropriate program in a secure facility for five years with persons his age or slightly older, albeit convicted as adults. 18 U.S.C. § 5037(c).

Accordingly, this court's and the Second Circuit's concern that Nelson would not be able to "fit into a program for the rehabilitation of juvenile delinquents," *United States v. Lemrick Nelson,* 68 F.3d at 589, if he were to retain juvenile status, seems to be misplaced. The statute does not appear to require Nelson be placed in a separate facility for those adjudicated as juveniles. No special contractual arrangement with State authorities is required as this court thought would be necessary at the time of the first hearing.

Furthermore, both psychologists indicated that Nelson would benefit from group therapy where the group is comprised of individuals his age and older. Berrill's Report at 16; Landmark's Testimony, Hearing Tr. at 210. Such programs appear to exist in any number of federal facilities. Generally, Ms. Schmidt explained, the inmates are located at facilities closest to their families. Hearing Tr. at 116. The inmates are required to get their high school diploma or G.E.D. equivalent. In addition, the Bureau of Prisons facilities offer college courses and vocational programs for the inmates, which are not nearly as limited as the California programs. Hearing Tr. at 117–18. Ms. Schmidt further testified that presently there are two individuals in adult prison who are over twenty-one who were convicted under the Juvenile Justice and Delinquency Prevention Act.[5] Hearing Tr. at 131. She concluded that a federal facility has a much wider range of programs than the California facilities. Also, the federal facility is not overcrowded and defendants can often be closer to their families. Hearing Tr. at 144–46. In any case, not only does the contractual relationship with the California facilities exist, but individuals who are twenty-one years old can be placed in federal facilities.

The government, however, contended at the hearing that if a defendant would be placed in an adult facility anyway, then there is no reason to utilize the juvenile statute. "Given that a defendant who is adjudicated as delinquent is going to be sent to the same place as if he was adjudicated guilty as an adult, that seems to us to cut against retaining juveniles. Then, the only difference would be the maximum period of incarceration." Hearing Tr. at 140. The government does not cite any case law to support its position. In one case this court found, the eighteen year old defendant was charged with seven armed robberies and one murder and had an extensive prior record. Because of these charges, "he no longer qualifie[d] for state programs." *United States v. M.H.,* 901 F.Supp. 1211, 1217 (E.D.Tx.1995). Still, the court held that "[t]his [sixth] factor should not weigh against the juvenile solely because the government fails to offer a treatment program." *Id.*

▪▪▪ Moreover, the government's position turns the statutory scheme on its head. In passing the Juvenile Justice and Delinquency Prevention Act, Congress intended that juveniles should be given a second chance, and rehabilitation should be the principal goal of the criminal justice system insofar as juveniles were concerned. Juvenile Justice and Delinquency Prevention Act, S.Rep. No. 1011, 93rd Cong., 2d Sess., 22 (1974), 1974 U.S.C.C.A.N. at 5286; S.Rep. No. 1989, 75th Cong., 3d Sess., 1 (1938). Even though, as noted by the Second Circuit, both the history of this case and the Georgia conviction, preclude Nelson from benefiting from the ameliorative purposes of anonymity and avoidance of the stigma of conviction that the statute generally provides, 18 U.S.C. § 5038(a), the predominant rehabilitory purpose of the statute remains.

Thus, in determining a juvenile's status, it is no minor point to note the difference in the sentence the defendant would receive if treated as a juvenile or an adult. Here, the difference entails a sentence of either five years or a guideline sentence ranging from a

---

5. Both appear to be in adult facilities due to their drug addiction. Ms. Schmidt testified: "One is a probation violator who is in there for use of drugs, and I think the other one has drug problems as well." Hearing Tr. at 131.

minimum of seventy months to life. U.S.S.G. §§ 2A1.1–2A1.3; § 2H1.3. This substantial difference in outcomes would certainly affect any rehabilitative prospects adversely.

■■■ Second, in accordance with the fundamental policy upon which this 1974 law rests, Congress recognized that the States had far greater experience in dealing with juvenile crime and were far better able to provide juvenile rehabilitative services than the federal government. *See* Juvenile Justice and Delinquency Prevention Act of 1974, 1974 U.S.C.C.A.N. 5283 ("While [juvenile crime] is essentially a State and local problem which must be dealt with by the State and local governments, Federal assistance is very necessary to provide needed financial assistance and resources."). The purpose of the Juvenile Justice and Delinquency Prevention Act was to "provide[ ] federal leadership and coordination of the resources necessary to develop and implement at the State and local community level effective programs for the prevention and treatment of juvenile delinquency." 1974 U.S.C.C.A.N. 5283. Thus, the lack of availability of appropriate programs in state facilities is an argument for retention of the case in the federal system, *see* 18 U.S.C. § 5032, ¶ 1(2), not an argument for transfer to adult status. The statutory policy requires that a lack of availability of appropriate programs in the state system should lead to a search for an appropriate program in the federal system.

Such a program does exist in which Nelson, if convicted, would spend five years in a secure facility which could provide him with counseling, therapy, as well as educational opportunities. Consequently, regardless of Nelson's age, there is an available program appropriate to his needs, even if he is convicted as a juvenile. Accordingly, this factor does not favor transfer to adult status.

### (6) Past Treatment Efforts

■■■ Finally, before addressing the critical issue of potential for rehabilitation, mention must be made of the fifth statutory factor, past treatment efforts and their success or lack of effectiveness.

As far as this court is aware, the only psychological assistance Nelson has received since the event in 1991 was minimal counseling while under arrest in the New York state case. Prior to 1991, the only counseling that Nelson had received was in school. Even Dr. Berrill, the government's expert, noted that this effort was "short lived." Berrill's Report at 16. This past treatment effort was "desultory," and the record is devoid of any real program which provided appropriate therapy or an adequate support structure. *See United States v. Juvenile Male # 1,* 47 F.3d 68, 70 (2d Cir.1995) (allowing the district court to weigh this factor, the lack of prior treatment, and the background of the defendant (factor two) more heavily than the seriousness of the offense and his prior record). Clearly, then, this factor provides no support for treating Nelson as an adult. The factor is a neutral one although one might well argue that, in light of the statutory policy favoring rehabilitation, there should be a presumption that the absence of any treatment efforts should favor an attempt at rehabilitation.

### Prospects for Rehabilitation

■■ All of the statutory factors, with the exception of the second, the seriousness of the offense, ultimately directly impact on the critical question of the prospects for the defendant's rehabilitation. This issue, therefore, deserves separate treatment.

The government has entered into evidence the defendant's plea agreement in the Georgia case, in which Nelson was convicted, as an adult, of aggravated assault for cutting the victim's jacket and skin with a razor blade, on January 14, 1994, and carrying a concealed weapon, a scalpel, on March 5, 1994. It has also entered into evidence a charge of resisting arrest in New York City on June 23, 1995, and judicial notice has been taken of the most recent charge of criminal trespass on February 8, 1996.

Both psychologists administered tests which, among other things, attempt to predict the probability of recidivism. Dr. Berrill's test results stated that Nelson had a "below average probability of success; tendency toward violent crime." As previously mentioned, this court does not understand what the "average probability of success" is, Gov't Ex. 4 at 3, but will assume it to be

"poor." Hearing Tr. at 94. Dr. Landsmark's similar test concluded that thirty-three percent of the individuals in Nelson's psychological type were not reconvicted in a four year post release survey. Hearing Tr. at 200–01; Def's Ex. D. While Dr. Landsmark did not characterize this figure, I view this result as indicative of a substantial potential for rehabilitation.

Both psychologists also testified as to the prospects for rehabilitation. Dr. Berrill testified that the prognosis for rehabilitation is "guarded," especially since Nelson does not feel that he needs treatment. Hearing Tr. at 38–39.

> [P]rognosis is really very guarded. Folks in this profile ... having been convicted of a violent crime ... [and] having anti-social behavior features. Basically, when you speak to folks like [this] they don't think anything is wrong with them, they think their behavior is perfectly fine, it's everybody else's problem; that the police caught them, that's the problem, or it was just bad luck that they are in the situation that they are in. Internally, they don't feel tremendous distress about who they are. They feel ultimately almost rather comfortable with that, so it's hard to jar someone out of that place ... *Id.*

Still, he did not conclude that rehabilitation was impossible. Hearing Tr. at 39.

Dr. Landsmark was also concerned by the fact that Nelson had created a pattern of anti-social actions rather than having just one isolated act. However, contrary to Dr. Berrill's opinion, she was firm in her opinion that Nelson did not have an anti-social personality disorder, but rather only exhibited these features at times. Hearing Tr. at 186. Moreover, Dr. Landsmark was optimistic that with treatment, Nelson could be helped. Specifically, she noted that "he has strengths that make it probable that he could [be rehabilitated] ... [H]is prognosis, in my opinion was fair to good." Hearing Tr. at 211–12.

Furthermore, according to Dr. Landsmark, Hearing Tr. at 248, Nelson's subsequent arrests are part of a consistent pattern, which began with the incident in this Information. They are indications that he is one in need of help, who has received no help, rather than a sign that he cannot be rehabilitated:

> [The fact that Nelson has been convicted in Georgia and charged with resisting arrest] doesn't surprise me, because as far as I know, this kid still needs help and nothing has happened intervening to change the way in which he has tried to solve the problems that he thinks he faces. So, I'm not surprised.... I still compare him with the population of kids that I work with, what they call the throwaway kids, who nobody wants, who has had more assistance than he seems to have had, and many of them have made it, all right? It's a matter of will, a matter of what you want. I believe this guy wants it.... [W]hen I knew him, he wanted the things that we say are values that we adhere to in this culture that we want; that are to be reached for.... Hearing Tr. at 248.

This court, in agreement with Dr. Landsmark, does not interpret these subsequent events—and especially the two most recent—to mean that Nelson cannot be rehabilitated, even assuming that he is guilty of those charges. *See U.S. v. Juvenile Male # 1*, 47 F.3d at 70–71 (downplaying his "extensive criminal history" including the fact that he "associates ... with a violent group of young men who have terrorized a neighborhood with weapons and physical violence," because he never was placed in a suitable treatment program).

Further, Dr. Landsmark explained that Nelson, who was first arrested in late adolescence, has a better prognosis for rehabilitation than one who began his career of crime earlier. Hearing Tr. at 205. She maintained that "he is not a lost kid. He wasn't someone who couldn't be reached.... He wasn't someone who didn't desire to learn and to make a better life for himself." Hearing Tr. at 210. She concluded her testimony by explaining that at the time she met him, Nelson's prognosis was "good," specifically stating: "I believe that he is someone that was workable." She would continue to stand by that prognosis despite the subsequent criminal activity in Georgia in large part because he still has not received treatment. Hearing Tr. at 248–50. Here again, I credit

the conclusion of Dr. Landsmark, finding it more persuasive.

\* \* \*

■ Although the Second Circuit pointed out "rehabilitation clearly is one of the primary purposes of the juvenile delinquency provisions," *United States v. Nelson,* 68 F.3d at 590, it clearly held that "a glimmer of hope in future treatment, standing alone, would be insufficient to warrant a finding that rehabilitation is likely."

In rejecting the "glimmer of hope" test, the Second Circuit cited the Fifth Circuit's decision in *United States v. Doe,* 871 F.2d 1248, 1253 (1989), which affirmed a transfer to adult status of a seventeen year old charged with armed robbery who had a large, although non-violent, prior record and prior, unsuccessful rehabilitative efforts. The legal standard set forth in *Doe* is whether a "juvenile has a realistic chance of rehabilitative potential," quoting *United States v. E.K.,* 471 F.Supp. 924, 932 (D.Ore.1979).

In *E.K.,* a seventeen year old with a deprived social background and a prior record charged with assault with a deadly weapon and burglary was not transferred to adult status because the court believed that despite "prior lack of success ... in other juvenile treatment facilities," there was a "realistic chance of rehabilitative potential." *Id.* The court concluded: "Thus, I am convinced that given the nature of E.K.'s problems ... as well as the escalating seriousness of the offenses with which he has been charged, I would have been required to grant the motion to transfer him to adult status, had there not existed the one specialized juvenile facility in Denver most likely to allow a chance for rehabilitation ..." *Id.* at 932–33. *See also United States v. M.H.,* 901 F.Supp. 1211, 1217 (E.D.Tx.1995) (transferring to adult status, one who does not have a "realistic chance of rehabilitative potential," who was eighteen when the crime was committed, had a history of poor school behavior and performance, with many prior offenses beginning when he was twelve, and had average intellectual ability and psychological maturity).

■ Accordingly, the question then becomes what showing is required to demonstrate a "realistic chance of rehabilitative potential?" Although actual percentages of probability have often been used to define various burden of proof standards, *see United States v. Fatico,* 458 F.Supp. 388 (E.D.N.Y.1978), *aff'd,* 603 F.2d 1053 (2d Cir. 1979), *cert. denied,* 444 U.S. 1073, 100 S.Ct. 1018, 62 L.Ed.2d 755 (1980), none of the "realistic chance of rehabilitative potential" cases equates the term with a particular percentage or burden of proof. It would appear that the term is equated best to a "reasonable probability" or substantial probability that rehabilitation will ensue. *Kyles v. Whitley,* —— U.S. ——, ——, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995) (in determining whether prosecution's failure to disclose *Brady* evidence requires a new trial, the Supreme Court held that its "reasonable probability" standard, as enunciated in *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985), is less than "more likely than not"). In other words, it is "less than a preponderance but more than a mere possibility," that the glimmer of hope test reflects. *In re Agent Orange Prod. Liab. Litig.,* 100 F.R.D. 718, 726 (E.D.N.Y.1983), *aff'd,* 818 F.2d 145 (2d Cir.1987), *cert. denied,* 484 U.S. 1004, 108 S.Ct. 695, 98 L.Ed.2d 648 (1988). Under this approach, this court need not find more than a fifty percent probability of successful rehabilitation.

So understood, a "realistic chance of rehabilitative potential" can be found here. Dr. Landsmark, whose opinion on this issue I accept, testified that the Carlson test, which she employed, predicted that thirty-three percent of the individuals with Nelson's characteristics were not reconvicted in four years and rated Nelson's overall prospects for successful rehabilitation as "fair to good." Hearing Tr. at 200–01; 211–12. Dr. Landsmark further stated that she herself would be willing to work with Nelson, indicating that she had worked with and rehabilitated individuals who had more severe conduct disorders than Nelson. Hearing Tr. at 248–50.

In addition, the previously discussed factors must also be considered to determine Nelson's chances of rehabilitation. Thus, Nelson had reached the age of 16 without

any prior criminal record. It is true that in February 1995 he was convicted of a violent offense in Georgia and has been charged with relatively minor offenses in New York. Nevertheless, for the reasons previously explained, this does not mean that rehabilitation is only a "mere possibility" in light of the fact that the defendant still has not received any treatment. Furthermore, Nelson's maturity level at present is one of an adolescent rather than a young adult.

■ The Second Circuit's opinion, however, while appearing to endorse the "realistic chance of rehabilitative potential" standard by its citation of *Doe*, itself used the term "likely." It is not clear what it meant by "likely." [6] I do not believe that the term "realistic chance of rehabilitative potential," as used in *Doe* or in ordinary discourse, is the equivalent of "likely." [7] Likely implies that the probability of rehabilitation occurring should be better than fifty percent. *See Branion v. Gramly*, 855 F.2d 1256, 1263 (7th Cir.1988), *cert. denied*, 490 U.S. 1008, 109 S.Ct. 1645, 104 L.Ed.2d 160 (1989) (equating "more likely than not" as a .51 probability).

In arguing what the government believed was the requisite standard, the government wrote in its brief to the Second Circuit that a court must "balance the juvenile law's rehabilitation ideal with 'the need to protect the public from violent and dangerous individuals and providing sanctions for anti-social acts.'" Brief to the Second Circuit for the United States at 37, citing *One Juvenile Male*, 40 F.3d at 844. The government argued that the "glimmer of hope" test did not adequately consider this balance.

Further, the government maintained that "[c]ontrary to [this] court's analysis, many courts have required that future treatment efforts possess more significant promise than a mere "glimmer of hope" in order to weigh against adult prosecution." Brief to the Second Circuit for the United States at 27. The government cited for this proposition two district court cases adopting the "realistic chance of rehabilitative potential" standard, *In re J. Anthony G.*, 690 F.Supp. 760, 762 (S.D.Ind.1988); *United States v. E.K.*, 471 F.Supp. 924, 932 (D.Or.1979), and one case adopting the standard of whether rehabilitation "would likely prove worthwhile or nothing more than a futile gesture." *In re T.W.*, 652 F.Supp. 1440, 1445 (E.D.Wisc.1987) (citing *United States v. E.K.*, *supra*).

Although the language of these cases do not appear to require a more probable than not standard, the Second Circuit, in rejecting the "glimmer of hope" standard, indicated a desire to have a rigorous determination when it referred to "a finding that rehabilitation is likely." *United States v. Lemrick Nelson*, 68 F.3d at 590. To me, this means "more likely than not" or the equivalent of the preponderance of evidence standard. This standard cannot be met on this record. Even Dr. Landsmark testified that Nelson's overall prospects of successful rehabilitation were only "fair to good." Hearing Tr. at 200–01; 211–12. Dr. Berrill's prognosis was even lower, relying primarily on the Jesness exam results. *Id.* at 39–44. I cannot find that it is "likely" that Nelson can be rehabilitated. Accordingly, employing the preponderance of the evidence standard on this critical ques-

---

**6.** Even the government conceded that: "The Court of Appeals leaves us with not total guidance what the standard is, quite frankly, your Honor. All they said is, glimmer of hope is not the standard." Hearing Tr. at 258. Ultimately, at the conclusion of the hearing, the government took the position that this court should consider the term "likely" to mean "more likely than not." Hearing Tr. at 278.

**7.** The dictionary defines likely as "of such a nature or so circumstanced as to make something probable ... having a better chance of existing or occurring than not; having the character of a probability ..." *Webster's Third New International Dictionary* (Unabridged ed. 1993).

Furthermore, *Black's Law Dictionary* defines the term as: "probable ... in all probability ... Likely is [a] word of general usage and common understanding, broadly defined as of such nature or so circumstantial as to make something probable and having [a] better chance of existing or occurring than not." *Black's Law Dictionary* 925 (6th ed. 1990) citing *People v. Randall*, 711 P.2d 689, 692 (Co.1985).

Realistic, on the other hand, although not found in the law dictionary, is defined as "advocating or characterized by philosophical or juristic realism; facing reality squarely, not impractical or visionary." *Webster's Third New International Dictionary*.

tion, this factor also weighs in favor of transfer to adult status.

### Weighing The Factors

■ The district court need not weigh all the statutory factors equally. *United States v. Lemrick Nelson,* 68 F.3d at 588. To me, two are the most important: first, the seriousness of the crime alleged, because when a crime is particularly serious, a court should weigh this factor more heavily than the others, *United States v. A.R.,* 38 F.3d 699, 705 (3d Cir.1994), and, second, the prospects for rehabilitation, because this is the primary purpose of the juvenile statute. *United States v. Lemrick Nelson,* 68 F.3d at 590.

The seriousness of the crime clearly weighs in favor of transfer to adult status, and as I understand the Second Circuit's decision, I reach a similar decision with respect to the second important factor. The other statutory factors become relevant principally because of the relationship they have to the prospects of rehabilitation. They are, therefore, entitled to some weight, but are not nearly as important as the second statutory factor (the seriousness of the crime alleged) and the overall question of whether rehabilitation is truly a feasible prospect. Although the other statutory factors either favor continued juvenile status or are neutral, because the two most important factors favor transfer, Nelson's status will be transferred to that of an adult.

### Conclusion

Based on the above, because of the seriousness of the crime charged as well as the finding that it is not "likely" that Nelson would be rehabilitated, the motion to proceed against the defendant as an adult is granted.

SO ORDERED.